J-A20022-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| RASSAN JOHNSON | |
| Appellant | No. 2045 EDA 2013 |

Appeal from the Judgment of Sentence March 4, 2013
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0000702-2011
CP-51-CR-0000703-2011

BEFORE: FORD ELLIOTT, P.J.E., MUNDY, J., and MUSMANNO, J.

MEMORANDUM BY MUNDY, J.: **FILED AUGUST 25, 2014**

Appellant, Rassan Johnson, appeals from the March 4, 2013 aggregate judgment of sentence of two consecutive terms of life imprisonment without the possibility of parole after a jury found him guilty of two counts of first-degree murder, and one count each of conspiracy, criminal attempt-murder, and burglary.[1] After careful review, we affirm.

The trial court has set forth the relevant facts and procedural history as follows.

> On June 16, 2005, at approximately 1 p.m., Kareem Alvarest was leaving his house in the Mantua section of Philadelphia when he ran into his friend

---

[1] 18 Pa.C.S.A. §§ 2502(a), 903, 901 (to commit first-degree murder), and 3502(a).

Lionel Campfield. Mr. Campfield was upset and told Mr. Alvarest that a mutual friend, Lamar Thomas, had just been murdered. The two men drove to the home of [Appellant], who was also a friend of Lamar Thomas. After Mr. Alvarest and Mr. Campfield arrived at [Appellant]'s home, the three men stood in [Appellant]'s yard and discussed Mr. Thomas's murder. The men theorized that two other men from the neighborhood, Alonzo Robinson and Elbert Tolbert, were responsible for the killing, and decided to take revenge. After awhile [sic], another man, Maurice Brown, joined Mr. Campfield, Mr. Alvarest, and [Appellant].[2] Mr. Brown told the three men that he knew where Mr. Tolbert's girlfriend, Holly Butts, lived. [Appellant] retrieved an AR-15 assault rifle and an AK-47 assault rifle from his house. [Appellant] gave Mr. Campfield the AK-47 and kept the AR-15. Mr. Brown then drove Mr. Campfield, Mr. Alvarest, and [Appellant] to Ms. Butts's home. On the way to Ms. Butts's home, the men stopped at a corner store and purchased red white and blue scarves, which [Appellant] and Mr. Campfield tied around their faces. Mr. Alvarest wore a hoodie, the strings of which he pulled tightly around his face.

Once they arrived at M[]s. Butts's home at 5863 Malvern Street, Mr. Brown pulled into the alleyway behind the house and pointed out to the other men a back door that led into Ms. Butts's basement. [Appellant], Mr. Campfield and Mr. Alvarest then got out of the car, with [Appellant] carrying the AR-15, Mr. Campfield carrying the AK-47, and Mr. Alvarest carrying his own .45 caliber handgun. [Appellant] kicked in the back door of Ms. Butts's home, and the three men entered the basement. They made their way through the basement and up the basement stairs.

[Appellant] kicked open the basement door that led into the main house and began firing towards a couch where Mr. Robinson was sitting. Mr. Campfield ran into the room after [Appellant] and began firing at Mr. Tolbert, chasing him up the stairs to the next floor. Eleven-year-old Nashir

- 2 -

Hinton, Holly Butts's son, was in the living room walking to the kitchen when the shooting commenced. Although Mr. Robinson and Mr. Hinton were each shot multiple times, Mr. Tolbert escaped unharmed.

After [Appellant] and Mr. Campfield together fired 29 rounds in the house, [Appellant], Mr. Campfield, and Mr. Alvarest ran out of the front door and got into Mr. Brown's car, which was parked outside. [Appellant] took over driving, and the four men fled the scene.

When police arrived at the scene of the shooting, Alonzo Robinson had suffered multiple gunshot wounds but was still alive. He was transported to the Hospital of the University of Pennsylvania, where he was pronounced dead at 11:40 p.m. He had been shot ten times, once in the head, twice in the left leg, three times in the right leg, once in the left arm, twice in the right arm, and once in the right hand. The medical examiner recovered five bullet jacket fragments, several copper and lead fragments, and a bullet core from Mr. Robinson's body, all of which were submitted to the police department's Firearms Identification Unit ("FIU") for testing. Nashir Hinton was pronounced dead at the scene at 8:25 p.m. He had been shot three times in the back and once in the right arm. The medical examiner recovered two bullets and a bullet jacket from Mr. Hinton's body, both of which were submitted to the FIU for testing. The FIU determined that those two bullets and the bullet jacket, and a bullet jacket recovered from Mr. Robinson's body, were all fired from the same type of AR-15 assault rifle.

When police processed the crime scene at 5863 Malvern Street, they recovered 60 pieces of ballistics evidence. This evidence including nineteen fired cartridge casings from 223 REM Wolf ammunition, which is manufactured for AR-15 assault rifles. The evidence also included ten fired cartridge casings from IK-85 Sherwood Import

Export Company ("SIEC") 7.62 x 39 ammunition, which is manufactured for AK-47 assault rifles. A bullet jacket recovered from the living room of the crime scene was fired from the same AR-15 with which Mr. Robinson and Mr. Hinton were shot.

On July 22, 2005, approximately one month after Alonzo Robinson and Nashir Hinton were killed, Robert Brooker was walking to a friend's house on 28th Street in North Philadelphia. When Mr. Brooker arrived at the house, he noticed that the door was ajar. He pushed the door further open, and [Appellant] pulled Mr. Brooker inside the house. [Appellant] was holding an AK-47 assault rifle, which he pointed at Mr. Brooker at close range. [Appellant] then fled out the front door. Mr. Brooker called the police, describing [Appellant] as wearing blue jean shorts and a white t-shirt, and carrying a duffle bag and an AK-47 assault rifle.

Philadelphia Police Sergeant Ezekiel Williams, who was in the area of 28th Street, received a radio call describing Mr. Brooker's attacker. He then saw [Appellant] walking down the street with a duffle bag in his hand. [Appellant] was wearing blue jean shorts and a white t-shirt, which matched the flash description. As Sergeant Williams got out of his patrol vehicle, [Appellant] set the bag in the middle of the street and ran towards Newkirk Street. Sergeant Williams began chasing [Appellant], but then returned to secure the duffle bag. When Sergeant Williams opened the bag, he observed an AK-47 assault rifle. Sergeant Williams put the bag in the trunk of his patrol car. He then spotted [Appellant] near the rear of a house on Newkirk Street, and began chasing him again before calling for backup. [Appellant] ran into an abandoned property. When backup arrived, they surrounded the building and captured [Appellant], who was then wearing the same blue jean shorts but a dark-colored shirt. Sergeant Williams identified him as the man who had dropped the bag in the street a few minutes earlier. Mr. Brooker was brought to the scene, and identified [Appellant] as the man who

pointed an AK-47 assault rifle at him. Both Sergeant Williams and Mr. Brooker noted to the police that [Appellant] had changed his clothes. [Appellant] was arrested for the illegal possession of the AK-47, which had 19 live rounds in the magazine.[3]

On November 6, 2008, Kareem Alvarest, who was serving a federal sentence for weapons charges, provided a statement to homicide detectives admitting to his participation in the shooting of Mr. Robinson and Mr. Hinton. Mr. Alvarest told the police the series of events surrounding the murders, including identifying [Appellant] as his co-conspirator, who shot both victims with an AR-15 assault rifle.

On May 4, 2010, Philadelphia Police Officer George Fox was patrolling Northwest Philadelphia with his partner, Officer Burke, when he observed a black Cadillac run a stop sign at the corner of 6th Street and Lindley Avenue in Philadelphia. Officer Fox activated his patrol car's lights and sirens, but [Appellant], who was driving the Cadillac, accelerated and did not pull over. As [Appellant] attempted to pass a tractor trailer, he struck a median. As soon as [Appellant]'s car struck the median, he jumped out of the driver's side door and began running down the street. [Appellant] was wearing tan pants and a red shirt. Officer Fox and Officer Burke both chased [Appellant], who jumped into an idling, driverless tow truck and fled the scene. At that point, Philadelphia Police Officer Clarence Irvine, who had responded to Officers Fox's call for backup, arrived on the scene and began pursuing [Appellant] in his patrol vehicle. After a few blocks, [Appellant] jumped out of the tow truck, and Officer Irvine began pursuing him on foot. Officer Irvine briefly lost sight of [Appellant] during the chase, and radioed for backup. Sergeant Steven Johnson responded to the call, surveyed the area, and saw [Appellant] running while discarding an item in an alleyway. Officer Johnson caught up to and apprehended [Appellant], who was now shirtless. The red shirt that [Appellant] had been wearing and

had discarded was recovered from an alleyway through which [Appellant] had run during the chase.

As Officers Irvine and Johnson were apprehending [Appellant], Officers Fox and Burke returned to [Appellant]'s car and observed an AR-15 assault rifle in the backseat. The officers remained with the car until it could be searched pursuant to a warrant. When [Appellant] was apprehended later that night, Officer Fox identified him as the man whom he saw flee the Cadillac earlier in the day. Police lifted fingerprints from the car, which matched [Appellant]'s fingerprints. [Appellant] was arrested for illegally possessing the AR-15 assault rifle.[4]

The AK-47 that was seized from [Appellant]'s bag on July 22, 2005, was submitted to the FIU for testing. The FIU determined that all of the SIEC fired cartridge casings that were ejected from the AK-47 assault rifle during the murder of Mr. Robinson and Mr. Hinton were fired by the AK-47 that was seized from [Appellant]. In addition, the 19 live rounds loaded in the AK-47 at the time that it was seized by the police were of the same SIEC brand as the fired cartridge casings that police recovered from the murder scene.

The AR-15 assault rifle that was seized from [Appellant]'s car on May 4, 2010, was likewise submitted to the FIU for testing. The FIU determined that the 223 REM caliber fired cartridge casings that police had recovered from the scene of the murder had insufficient markings to determine whether they were fired from the same AR-15 that was seized from [Appellant], but was able to determine that they were all consistent with being fired from an AR-15 like the one seized. [Appellant] was arrested for the murders.

_____

[2] Alonzo Robinson was known by the nickname "Onion," Elbert Tolbert by "El Murda," Lionel Campfield by "Man Man," Lamar Thomas by "Marty

Cool," Kareem Alvarest by "Reem," and Maurice Brown by "Fat Mark."

[3] For the events that transpired on July 22, 2005, [Appellant] was charged with one count each of carrying a firearm without a license (18 Pa.C.S. § 6106(a)(I)), possessing an instrument of crime (18 Pa.C.S. § 907(a)), and simple assault (18 Pa.C.S. § 2701(a)). He was tried and acquitted of all charges.

[4] For the events that transpired on May 4, 2010, [Appellant] was charged with one count of possession of a firearm a prohibited person (18 Pa.C.S. § 6105(a)(1)) at docket number CP-51-CR-0011286-2010. The case was *nolle prossed* after federal authorities took over the prosecution.

Trial Court Opinion, 10/17/13, at 3-8 (internal citations omitted; footnotes in original).

On February 25, 2013, Appellant's jury trial commenced. On March 4, 2013, following a five-day trial, the jury found Appellant guilty of the aforementioned charges. On that same day, Appellant was sentenced to an aggregate term of life imprisonment without the possibility of parole.[2] On March 12, 2013, Appellant filed a timely post-sentence motion asserting, *inter alia*, the evidence was insufficient to convict him on all charges because there was contradictory evidence as to whether he was present at the time

_____

[2] Specifically, Appellant was sentenced to consecutive terms of life imprisonment without the possibility of parole on the first-degree murder charges, and concurrent sentences of nine years and six months to 20 years' imprisonment on the criminal attempt charge, and five to ten years on the burglary charge. For purposes of sentencing, the conspiracy charge merged with the first-degree murder and no further penalty was imposed.

the crimes took place, and, in the alternative, that the verdict was against the weight of the evidence. Appellant's Motion for Post Sentence Relief, 3/12/13, at 1-2. Thereafter, on June 26, 2013, the trial court denied Appellant's post-sentence motion. On July 23, 2013, Appellant filed a timely notice of appeal.[3]

On appeal, Appellant raises the following issues for our review.

> I.    Is Appellant entitled to an arrest of judgment on two counts of Murder in the First Degree and related offenses where the evidence is insufficient to sustain the verdict as the Commonwealth did not prove Appellant was a principal, a co-conspirator or an accomplice[,] nor did they prove specific intent to kill and malice?
>
> II.   Is Appellant entitled to a new trial on two counts of First Degree Murder and related offenses where the verdict is not supported by the greater weight of the evidence?
>
> III.  Is Appellant entitled to a new trial as a result of the [t]rial [c]ourt's error in admitting the AK-47 assault rifle into evidence, without permitting Appellant to introduce evidence of [] Appellant's acquittal of possessing the said rifle, making the assault rifle irrelevant and its admission, without the additional evidence, unfairly prejudicial to Appellant?
>
> IV.   Is Appellant entitled to a new trial as a result of [t]rial [c]ourt error where the [trial c]ourt prohibited the defense from cross-examining Kareem Alvarest, a cooperating witness, regarding the factual basis of his guilty plea?

_____

[3] Appellant and the trial court have complied with Pa.R.A.P. 1925.

Appellant's Brief at 3.[4]

In his first issue, Appellant asserts the evidence was insufficient to sustain the verdict. *Id.* at 25. Specifically, Appellant avers that the "evidence did not establish Appellant intentionally killed the victim[,]" and "[t]hus, there could **not** be murder in the first degree." *Id.* (emphasis in original). Additionally, Appellant argues there was insufficient evidence to prove a conspiracy existed. *Id.* at 26.

Our standard of review regarding a challenge to the sufficiency of the Commonwealth's case is well settled. "In reviewing the sufficiency of the evidence, we consider whether the evidence presented at trial, and all reasonable inferences drawn therefrom, viewed in a light most favorable to the Commonwealth as the verdict winner, support the jury's verdict beyond a reasonable doubt." *Commonwealth v. Patterson*, 91 A.3d 55, 67 (Pa. 2014) (citation omitted). "The Commonwealth can meet its burden by wholly circumstantial evidence and any doubt about the [Appellant]'s guilt is to be resolved by the fact finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances." *Commonwealth v. Watley*, 81 A.3d

_____

[4] We note that Appellant has discussed the issues in his brief in a different order than they appear in his statement of questions on appeal. For purposes of our review, we elect to address them in the order as presented in the statement of questions.

108, 113 (Pa. Super. 2013) (*en banc*) (internal quotation marks and citation omitted), *appeal denied*, --- A.3d ---, 1033 MAL 2013 (Pa. 2014).  As an appellate court, we must review "the entire record … and all evidence actually received[.]"  ***Id.***  "[T]he trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced is free to believe all, part or none of the evidence."  ***Commonwealth v. Kearney***, 92 A.3d 51, 64(Pa. Super. 2014) (citation omitted).  "Because evidentiary sufficiency is a question of law, our standard of review is *de novo* and our scope of review is plenary."  ***Commonwealth v. Diamond***, 83 A.3d 119, 126 (Pa. 2013) (citation omitted).

Prior to addressing the merits of Appellant's claim, we must first determine whether Appellant has complied with Pennsylvania Rule of Appellate Procedure 1925(b) to preserve this issue for our review.  Rule 1925(b) by its text requires that Rule 1925(b) statements "identify each ruling or error that the appellant intends to challenge with sufficient detail to identify all pertinent issues for the judge."  Pa.R.A.P. 1925(b)(4)(ii); ***see also Commonwealth v. Reeves***, 907 A.2d 1, 2 (Pa. Super. 2006) (stating "[w]hen a court has to guess what issues an appellant is appealing, that is not enough for meaningful review[]"), *appeal denied*, 919 A.2d 956 (Pa. 2007).  Any issues not raised in accordance with Rule 1925(b)(4) will be deemed waived.  Pa.R.A.P. 1925(b)(4)(vii).  Our Supreme Court has made clear that Rule 1925(b) is a bright-line rule.  ***Commonwealth v. Hill***, 16

A.3d 484, 494 (Pa. 2011). Additionally, with regard to claims pertaining to the sufficiency of the Commonwealth's evidence, we have stated as follows.

> In order to preserve a challenge to the sufficiency of the evidence on appeal, **an appellant's Rule 1925(b) statement must state with specificity the element or elements upon which the appellant alleges that the evidence was insufficient**. Such specificity is of particular importance in cases where, as here, the appellant was convicted of multiple crimes each of which contains numerous elements that the Commonwealth must prove beyond a reasonable doubt.

*Commonwealth v. Garland*, 63 A.3d 339, 344 (Pa. Super. 2013) (internal quotation marks and citations omitted; emphasis added).

In the case *sub judice*, in regard to his sufficiency claims, Appellant's 1925(b) statement merely stated that "[t]he evidence was insufficient to support the conviction." Appellant's Rule 1925(b) Statement, 9/12/13, at 3, ¶ 11. Based on our cases, we are constrained to conclude that Appellant has not complied with Rule 1925(b) because his statement fails to specify which elements of which offenses the Commonwealth did not prove beyond a reasonable doubt. *See Garland*, *supra* (concluding that Garland's bald Rule 1925(b) statement that "[t]he evidence was legally insufficient to support the convictions[]" was non-compliant with Rule 1925(b)); *Commonwealth v. Williams*, 959 A.2d 1252, 1256 (Pa. Super. 2008) (concluding that Williams' bald Rule 1925(b) statement that "[t]here was insufficient evidence to sustain the charges of Murder, Robbery, VUFA no license, and VUFA on the streets … [t]hus [Appellant] was denied due

- 11 -

process of law[]" was non-compliant with Rule 1925(b)). Therefore, we cannot reach the merits of Appellant's first issue.

In his second issue, Appellant argues that he must be awarded a new trial because the verdict is not supported by the greater weight of the evidence. Appellant's Brief at 32. Specifically, Appellant asserts that the evidence "stands for the proposition that three men and three men only committed the crime[,]" and that those men were Brown, Campfield, and Alvarest. *Id.* at 33. Appellant claims that the testimony of Tolbert "exonerates Appellant and contradicts the testimony of Alvarest when Tolbert himself had absolutely no motive to fabricate such testimony." *Id.* Appellant further argues the Commonwealth "did not establish that on the day of this offense, that Appellant was present, had the weapon and used it." *Id.* It is Appellant's position that "[i]t remains all speculation, conjecture and surmise[.]" *Id.* Therefore, Appellant argues the trial court erred in denying his post-sentence motion, and that he should be awarded a new trial because the verdict is against the weight of the evidence. *Id.* at 33-34.

We begin by noting, "[a] claim alleging the verdict was against the weight of the evidence is addressed to the discretion of the trial court." *Commonwealth v. Landis*, 89 A.3d 694, 699 (Pa. Super. 2014) (citation omitted). An argument that the jury's verdict was against the weight of the evidence concedes that the evidence was sufficient to sustain the

convictions. ***Commonwealth v. Lyons***, 79 A.3d 1053, 1067 (Pa. 2013), *cert. denied*, ***Lyons v. Pennsylvania***, 134 S. Ct. 1792 (2014). Our Supreme Court has recently admonished that "[a] new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion." ***Commonwealth v. Clay***, 64 A.3d 1049, 1055 (Pa. 2013) (citation omitted). Instead, "the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice." ***Id.*** (internal quotation marks and citation omitted). "[A] new trial should be awarded when the jury's verdict is so contrary to the evidence as to shock one's sense of justice …." ***Id.***

As an appellate court it "is not [our role] to consider the underlying question of whether the verdict is against the weight of the evidence." ***Commonwealth v. Morales***, 91 A.3d 80, 91 (Pa. 2014) (citation omitted). An argument that the jury's verdict was against the weight of the evidence remains "[o]ne of the least assailable reasons for granting … a new trial …." ***Id.*** (citation omitted). "Thus, only where the facts and inferences disclose a *palpable abuse of discretion* will the denial of a motion for a new trial based on the weight of the evidence be upset on appeal. ***Id.*** (citation omitted; emphasis in original).

Instantly, a review of the record reveals Appellant's claim is without merit. First, the Commonwealth presented the testimony of several police officers, the medical examiner, and experts who testified to the results of the testing conducted by the FIU and subsequent ballistics reports. Dr. Edwin Lieberman, a medical examiner in the Philadelphia Medical Examiner's Office, testified that he performed an autopsy on Hinton and concluded Hinton died of four gunshot wounds and the manner of death was homicide. N.T., 2/27/13, at 173. Further, he testified that his colleague, Dr. McDonald, performed an autopsy on Robinson, the results of which revealed Robinson died of multiple gunshot wounds, including to the head, and the manner of death was homicide. *Id.* at 163-167. Additionally, the testing done by the FIU revealed that the bullet's recovered from Hinton's body were fired from an AR-15 assault rifle, and that the crime scene contained nineteen fired cartridge casings from an AR-15 as well as ten fired cartridge casings from an AK-47. N.T., 3/1/13, at 86-87.

In addition to the officers and experts that testified during the Commonwealth's case-in-chief, Appellant's co-defendant, Alvarest, also testified to his involvement and recollection of the crime. Alvarest testified that on the date of the incident, Brown drove Alvarest, along with Appellant and Campfield, to Holly Butts's house where they believed Tolbert and Robinson would be. N.T., 2/26/13, at 181. Alvarest brought his own .45 caliber handgun with him, while Appellant brought an AR-15 and gave

Campfield an AK-47. *Id.* at 182. According to Alvarest, Brown remained with the car while he entered Butts's basement with Appellant and Campfield. *Id.* at 185. Upon entering the house Alvarest testified that Campfield began firing at Tolbert while Appellant began firing at Robinson who was on the couch. *Id.* at 186-187. Alvarest stated that he never fired his own weapon. *Id.* at 187. Alvarest was subsequently arrested on federal charges, and in November of 2008 was also arrested for the murders of Hinton and Robinson. *Id.* at 191-192. On November 6, 2008, Alvarest gave a statement regarding the murders of Hinton and Robinson. *Id.* at 192.

To rebut Alvarest's testimony, Elbert Tolbert was called by the defense and testified that on the date of the incident he was standing in Butts's house by the front door when he saw three people kick in the back door and enter the house. N.T., 3/4/13, at 22. Tolbert stated Hinton was in the kitchen when the three men, who he identified as, Alvarest, Campfield, and Brown, came in the door shooting. *Id.* at 23. Tolbert stated that as the men entered the house he "ran up the steps. They chased me up the steps shooting." *Id.* Tolbert identified Brown as carrying the AK-47 and shooting at him and Robinson. *Id.* at 26. Tolbert indicated he could not identify the type of gun Alvarest was carrying but that he saw him shooting at Hinton and Robinson. *Id.* at 27-28. Finally, Tolbert stated that he did not see Campfield with a gun. *Id.* at 28.

Subsequent to the incident Tolbert gave a statement to police at which time he chose four photos as being those of the shooters from an array of 18. *Id.* at 37-41. The four photos Tolbert identified were that of Alvarest, Campfield, Brown and Appellant. *Id.* Tolbert stated he told police at the time he didn't know if Appellant was the person he saw or not, and later told police he saw Appellant outside through a bedroom window when the shooting occurred. *Id.* at 43. Tolbert indicated he entered an agreement to testify for the Commonwealth in exchange for pleading guilty to third degree murder for the murder of Lamar Thomas. *Id.* at 47. On cross-examination the Commonwealth called Tolbert's version into question noting that at no time between the date of the incident on June 17, 2005 and the date he entered a plea agreement with the Commonwealth on December 14, 2006, did he ever identify any of the men involved in the incident. *Id.* at 78. Only upon entering the agreement did Tolbert give police a statement and identify the four defendants. *Id.*

The jury, as fact-finder, was presented with conflicting eye-witness accounts by two different witnesses. The jury found Alvarest's version of the events credible, and elected not to believe Tolbert's version of the events. It is well established that this Court is precluded from reweighing the evidence and substituting our credibility determination for that of the fact-finder. *See Commonwealth v. Champney*, 832 A.2d 403, 408 (Pa. 2003) (citations omitted) (stating, "[t]he weight of the evidence is exclusively for the finder

of fact who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses[]"), *cert. denied*, **Champney v. Pennsylvania**, 542 U.S. 939 (2004).  Herein, the jury after weighing the testimony of both Alvarest and Tolbert chose to accept Alvarest's version of the events.  As noted, we cannot reweigh the evidence, and Appellant has failed to show how the trial court palpably abused its discretion in declining to do the same.  **See Morales**, **supra**.  Accordingly, we will not disturb the jury's credibility determinations on appeal, and discern no error on the part of the trial court in dismissing Appellant's weight of the evidence claim.

In his third issue, Appellant argues that the trial court erred in allowing Ronald Brooker to testify to the July 22, 2005 incident involving the AK-47 rifle, without allowing Appellant to introduce evidence of his acquittal in a separate trial of possessing said rifle.  Appellant's Brief at 13.  Specifically, Appellant asserts he was prejudiced as it was "grotesquely unfair for a jury to have been given the permission to infer that Appellant had actually possessed that AK-47 several weeks after this incident and that he was guilty of that crime when, in fact, he had been acquitted of that crime."  **Id.** at 15-16.

In reviewing Appellant's claim, we are guided by the following.

> The admissibility of evidence is at the discretion of the trial court and only a showing of an abuse of that discretion, and resulting prejudice, constitutes reversible error.  An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of

judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record. Furthermore, if in reaching a conclusion the trial court over-rides or misapplies the law, discretion is then abused and it is the duty of the appellate court to correct the error.

*Commonwealth v. Fischere*, 70 A.3d 1270, 1275 (Pa. Super. 2013) (*en banc*) (citations and internal quotation marks omitted), *appeal denied*, 83 A.3d 167 (Pa. 2013). "With regard to the admission of weapons evidence, such evidence is clearly admissible where it can be shown that the evidence was used in the crime charged." *Commonwealth v. Stokes*, 78 A.3d 644, 654 (Pa. Super. 2013) (citations omitted).

Instantly, the crux of Appellant's argument on appeal is that the trial court abused its discretion in prohibiting him from introducing evidence of his acquittal of possessing the AK-47 in the July 22, 2005 incident in response to the Commonwealth's admission of the testimony of witness Robert Brooker. Appellant's Brief at 15. Appellant avers that "the prejudice was untold[,]" because the Commonwealth was permitted to introduce evidence of Appellant's possession of the AK-47 which was "to be identified as, at least, being one of the murder weapons in the current case but that same jury was not going to be informed that Appellant had been _acquitted_ of the prior offense." *Id.* (emphasis in original). It is Appellant's contention

- 18 -

that "[t]he case law compels the admission of the prior acquittal."[5]  *Id.* at 16.

We begin by addressing the applicable Pennsylvania Rules of Evidence. Rule 403 governs evidence that may be excluded as its probative value is outweighed by some other factor, and Rule 404 governs the admissibility of prior bad acts.

> **Rule 403. Excluding Relevant Evidence for Prejudice, Confusion, Waste of Time, or Other Reasons**
>
> The court may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

Pa.R.E. 403.

> **Rule 404. Character Evidence; Crimes or Other Acts**
>
> …
>
> **(b) Crimes, Wrongs or Other Acts.**

_____

[5] We note that Appellant fails to cite any case law in support of his contention that the trial court was compelled to admit the prior acquittal. Rather, the only case law Appellant addresses, and distinguishes, aside from stating the applicable standard of review, is **Commonwealth v. Young**, 989 A.2d 920 (Pa. Super. 2010), which was relied on by the trial court in its Rule 1925(a) opinion.  Further, we elect not to address **Young** as it is only relevant to whether the trial court properly allowed the admission of the Commonwealth's evidence pertaining to the July 22, 2005 incident, an issue not raised before this Court.  The scope of Appellant's issue on appeal pertains solely to the exclusion of the evidence of his prior acquittal.

…

> *(2) Permitted Uses.* This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice.

***Id.*** 404(b).

Herein, the trial court determined that evidence of the underlying incident which occurred on July 22, 2005 was admissible, a determination that Appellant does not challenge. However, the trial court determined that Appellant's acquittal for the weapons charge in connection to the possession of the AK-47 arising from said incident was nonetheless inadmissible. Rule 403 states a trial court may exclude relevant evidence if it risks causing one of the following: "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Pa.R.E. 403. In its Rule 1925(a) opinion, the trial court determined that the evidence of Appellant's acquittal should be excluded because the Commonwealth was without the benefit of Brooker's testimony in Appellant's first trial, as well as the testimony of several other police officers, and therefore it would have "been confusing and misleading to inform the jury of the acquittal." Trial Court Opinion, 10/17/13, at 12.

Upon review, we conclude the trial court abused its discretion in excluding the evidence of Appellant's acquittal pertaining to the July 22,

2005 AK-47 possession charges. The trial court has failed to provide a compelling explanation as to why any of the reasons set forth in Rule 403 were met. The trial court's determination that evidence would have been "confusing and misleading" to the jury is not supported by the record. Rather, the jury, as fact-finder, should have been given the opportunity to weigh Brooker's testimony, in light of the acquittal, and determine his credibility and the weight to be given to said testimony.

Our inquiry, however, does not end here as we conclude said error by the trial court was harmless.

> It is well established that an error is harmless only if we are convinced beyond a reasonable doubt that there is no reasonable possibility that the error could have contributed to the verdict. The Commonwealth bears the burden of establishing the harmlessness of the error. This burden is satisfied when the Commonwealth is able to show that: (1) the error did not prejudice the defendant or the prejudice was de minimis; or (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial [e]ffect of the error so insignificant by comparison that the error could not have contributed to the verdict.

*Commonwealth v. Green*, 76 A.3d 575, 582 (Pa. Super 2013) (citiation omitted), *appeal denied* 87 A.3d 318 (Pa. 2014). "Whenever there is a 'reasonable possibility' that an error 'could have contributed to the verdict,' the error is not harmless." *Commonwealth v. Luster*, 71 A.3d 1029, 1046 (Pa. Super. 2013) (*en banc*) (citation omitted), *appeal denied*, 83 A.3d 414

(Pa. 2013) (holding the trial court abused its discretion in allowing into evidence the victim's hearsay statement, but said error was nevertheless harmless as the evidence "was merely cumulative of other evidence[]"). *Id.* at 1042.

In its brief the Commonwealth argues the evidence was "non-prejudicial because the evidence tying [Appellant] to the AK-47 was overwhelming." Commonwealth's Brief at 14.

> The homicide jury, unlike the prior jury, heard not only police testimony that the AK-47 was recovered from a bag that [Appellant] abandoned, but testimony from the robbery victim describing the robbery and the bag in which the rifle had been placed. In addition, the homicide jury, unlike the prior jury, heard ballistics evidence conclusively tying the AK-47 to murders in which one of [Appellant]'s own co-conspirators testified he was an active participant and had supplied the gun.

*Id.* (citations omitted).

Instantly, the jury had the testimony of Appellant's co-defendant, Alvarest, placing him at Holly Butts's house on the date of the incident and firing an AR-15 at Robinson who was sitting on the couch. N.T., 2/26/13, at 181. Additionally, Tolbert's testimony placed Appellant at the incident despite the credibility issues the jury had with his testimony as to who entered the house and shot the victims. Further, the jury also heard the testimony of Officer Fox that on May 4, 2010, Appellant was apprehended in a separate incident when he failed to pull over after running a stop sign. N.T., 2/27/13, at 121-122. After Appellant's vehicle struck a median he took

off running, a tow truck driver stopped to help the officers at which time Appellant jumped in the tow truck and took off with it. *Id.* at 123-124. Officer Fox stayed with Appellant's abandoned vehicle wherein they recovered an AR-15 from the back seat. *Id.* at 126. In light of all the evidence the jury was presented with, we conclude that it was harmless error to exclude Appellant's prior acquittal for possessing the AK-47. *See Stokes*, *supra* at 656 (holding "[a]s the evidence of guilt in this case was fairly overwhelming, the error in admitting the above evidence did not contribute to the jury's verdict").

Finally, in his last issue, Appellant argues that the trial court erred in prohibiting the defense from cross-examining cooperating witness, Kareem Alvarest, regarding the factual basis of his guilty plea. Appellant's Brief at 18. Appellant argues that at trial Alvarest "absolved himself of responsibility for the shooting but placed it on others, including Appellant." *Id.* Appellant continues, "[h]owever, previously, when Alvarest pled guilty, he acknowledged during the factual basis for the plea that he had possessed a firearm and that he had shot at least one of the victims." *Id.* Accordingly, Appellant argues the trial court erred in sustaining the Commonwealth's objection to allowing the defense to cross-examine Alvarest on the basis of his plea.

As stated above, the admissibility of evidence is within the sound discretion of the trial court and will only be reversed upon a showing of an

abuse of discretion. *Fischere*, *supra*. "Additionally, it is well settled the trial court has the discretion to determine the scope and limits of cross-examination and that this Court cannot reverse those findings absent a clear abuse of discretion or an error of law." *Commonwealth v. Washington*, 63 A.3d 797, 805 (Pa. Super. 2013).

In the instant matter, Alvarest entered a plea agreement with the Commonwealth to testify against his co-defendants in exchange for leniency at the time of sentencing. In considering Alvarest's testimony the jury was informed that, Alvarest had given a statement to the police at the time of his arrest that he was bound by, he had plead guilty to the murders of both Robinson and Hinton, and that he was currently in federal prison. N.T., 2/26/13, at 210-216. Specifically, at trial, the Commonwealth covered the underlying agreement with Alvarest as follows.

> Q.  Now, on the second page it talks about the agreement and it says at the top there, therefore, it is hereby agreed by and between Kareem Alvarest and the district attorney that, and that second paragraph, it talks about how the determination of whether or not you have cooperated completely and to what extent lies solely in the discretion of the district attorney; correct?
>
> A.  The – I see the paragraph. I understand he will participate in the investigation of those matters only at the discretion of the district attorney's office and any other investigative or prosecutorial department or agency.
>
> …

Q. Now, on page three, line seven – I am sorry – paragraph seven, you see where your guilty plea agreement indicates what you are pleading guilty to?

A. Yes.

Q. And it says there you will enter a plea of guilty to the murder of the third degree of Alonzo Robinson and the murder of the third degree of Nashir Hinton?

A. Yes.

Q. And there are some other charges in there too; right?

A. Yes, sir.

…

Q. And you understand if the district attorney's office declares your agreement null and void, you will not be able to withdraw your plea; right?

A. Yes.

Q. And the district attorney will not be bound by any obligations under this agreement; correct?

A. Yes.

Q. And, basically, this locks you into that first statement; correct?

…

A. Yes.

N.T., 2/26/13, at 210, 212, 215.

The specific objection Appellant complains about on appeal, and ruling by the trial court, unfolded as follows.

> [Defense Counsel]: And the final portion I wanted to go over was the recitation of the facts, the factual statement where [A.D.A. Fairman] reads in that Mr. Tolbert would testify that this defendant, meaning Mr. Alvarest, was carrying a firearm and began to shoot at Alonzo Robinson who was known by the nickname of Onion as Onion was on the couch, and then later when Mr. Alvarest agrees to that factual basis as being true.
>
> The Court: Which portion of the factual basis?
>
> [Defense Counsel]: Page twenty-four, Your Honor, line one. Mr. Tolbert would testify --- and this is [A.D.A.] Fairman speaking - - Mr. Tolbert would testify that this defendant, who he would identify as - -
>
> …
>
> I believe he would call him Reem, and others burst into that door from the basement. This defendant, meaning Mr. Alvarest, was carrying a firearm at the time and began to shoot at Alonzo Robinson, who was known by the nickname of Onion, as Onion was on the couch.
>
> The Court: You know, listen. Do you have an objection to this?
>
> [A.D.A.] Fairman: I do, Your Honor.

*Id.* at 234-235.

Essentially, Appellant contends that the Assistant District Attorney's factual recitation at Alvarest's guilty plea hearing amounts to a prior statement by Alvarest that should have been admissible grounds for cross-

examination. Appellant's Brief at 21. In response to said objection, the trial court ruled as follows.

> [The Court:] It says, "Did you hear and understand the summary of the facts?"
>
> And he says, "Yes."
>
> He says, "In the course of that summary, she made reference to your statement to homicide detectives. Are you familiar with that?"
>
> And he says, "Yes."
>
> And he asks him, the judge asks him, "Do you adopt and agree with that, the answers that you gave to the questions put to you in that statement?" And then he says, "That statement plus the other evidence, which Ms. Fairman has summarized, if offered at a trial and accepted as true would be sufficient. Do you understand that?
>
> "Yes."
>
> "Do you accept these allegations as true for purposes of this agreement today." That does not, in my view, have him adopt every sentence that was stated. If anything, I would permit you to bring out that he swore to Judge Lerner that his statement was true, if you wanted to cross-examine him with the statement, but the fact that she in her allocution with Judge Lerner says a detail that is inconsistent with the statement and inconsistent with his testimony here, and he does not correct the judge and interrupt it, to me, that is not a prior inconsistent statement. So I am going to sustain the objection.
>
> …
>
> He never even asked do you accept the rendition of the facts as being true. He asked, do you accept the statement as being true? Do you

- 27 -

> accept the allegations as being true? He is guilty of all those charges. That's all true. So I don't think that's a fair cross-examination.
>
> I made my ruling. Argument is over. We'll bring the jury out.
>
> Your issue is preserved.

N.T., 2/26/13, at 240.

Upon review, we conclude that the trial court did not abuse its discretion in sustaining the Commonwealth's objection to the admission of the assistant district attorney's recitation of the facts. First, Tolbert did in fact testify at trial, and Appellant had the opportunity to cross-examine him. Second, the defense was in possession of Alvarest's statement made to the homicide detectives and could have impeached him with any portion of that statement. Finally, the factual recitation of the facts made by the assistant district attorney was not a prior statement by Alvarest but rather by the A.D.A.[6] Accordingly, the trial court did not abuse its discretion in sustaining the Commonwealth's objection.

Based on the foregoing, we conclude Appellant's issues are either waived or devoid of merit. Therefore, we affirm the trial court's March 4, 2013 judgment of sentence.

Judgment of sentence affirmed.

_____

[6] We note that we can affirm the trial court's decision on any legal basis supported by the record. *Commonwealth v. Doty*, 48 A.3d 451, 456 (Pa. Super. 2012) (citation omitted).

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>8/25/2014</u>