J.S45037/14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DARNELL LEE, | : | |
| | : | |
| Appellant | : | No. 2383 EDA 2013 |

Appeal from the Judgment of Sentence March 1, 2013
In the Court of Common Pleas of Philadelphia County
Criminal Division No(s).: CP-51-CR-0005987-2009

BEFORE: BOWES, WECHT, and FITZGERALD,[*] JJ.

MEMORANDUM BY FITZGERALD, J.:          **FILED SEPTEMBER 23, 2014**

Appellant, Darnell Lee, appeals from the judgment of sentence entered in the Philadelphia County Court of Common Pleas following his jury trial and convictions for second degree murder,[1] robbery,[2] carrying a firearm on a public street or public property in violation of the Uniform Firearms Act,[3] and conspiracy.[4]  Appellant asserts that he is entitled to a new trial because the

---

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S. § 2502(b).

[2] 18 Pa.C.S. § 3701(a)(1)(i).

[3] 18 Pa.C.S. § 6108.

[4] 18 Pa.C.S. § 903(a)(1).

guilty verdicts of murder and robbery were against the weight of the evidence. We affirm the convictions but vacate the judgment of sentence for robbery because it merged with his second degree murder conviction for purposes of sentencing.

The trial court summarized the facts of this case as follows:[5]

> On June 3, 2008, at about 9:30 p.m., [the victim] Kareem McCoy [("McCoy")], Jasmine Fields [("Fields")], McCoy's brother, and Fields' sister all went to Lid's Pike Bar at 3858 North 15th Street, Philadelphia. Around 11:20 p.m., McCoy and Fields left the bar and entered McCoy's four-door white Chevrolet Malibu parked on the 1500 block of Pike Street. While McCoy and Fields were sitting in the vehicle, [Appellant] and [his co-defendant] Daniel Johnson [("co-defendant")] rode their bicycles up to the vehicle. **[Appellant] approached McCoy on the driver's side and co-defendant approached Fields on the passenger side of the vehicle.** [Appellant] then said, "You know what this is" and lifted his hoodie to show a big silver gun that was tucked into his waistband. McCoy said, "You got this, homey" and handed [Appellant] his watch and money. When McCoy told [Appellant] that his phone had dropped between the driver's seat and door, [Appellant] and co-defendant both said, "Well, pick it up then." Instead of picking up the phone, McCoy exited his vehicle and started fighting with [Appellant]. During this struggle, [Appellant] and McCoy moved toward the rear of the vehicle, where McCoy was shot at least twice. McCoy was shot a third time after co-defendant ran to the rear of the vehicle. This shooting occurred at or around 11:31 p.m. on June 3, 2008.

---

[5] Appellant was tried jointly with his co-defendant, Daniel Rasheed R. Johnson. As we discuss *infra*, a prior panel of this Court, in the direct appeal of Appellant's co-defendant, affirmed in part and vacated in part. **Commonwealth v. Johnson**, 213 EDA 2013 (unpublished memorandum) (Pa. Super. Dec. 19, 2013).

Afterward, [Appellant] jumped onto a bicycle and fled toward 16th and Smedley Streets. As Fields tried to exit the front passenger door, co-defendant's bicycle became stuck under the vehicle. Fields made eye contact with co-defendant, who then ran in the same direction as [Appellant]. When Fields exited the vehicle, she approached McCoy and saw him lying on the ground. He had a hole in his face and was struggling to breathe. Blood was pooled behind his head and was coming from his face and hand. Fields called 911 and ran into the bar, where she encountered McCoy's brother.

McCoy was transported to Temple University Hospital, where he was pronounced dead at approximately 1:27 a.m. on June 4, 2008. Dr. Gary Collins, deputy chief medical examiner, conducted an autopsy of McCoy's body. While performing his examination, Dr. Collins found that McCoy sustained three gunshot wounds. Two gunshot wounds were penetrating wounds and one gunshot wound was a perforating wound. . . .

Dr. Collins concluded to a reasonable degree of medical certainty that the cause of death was the penetrating gunshot wound to the head. . . . Dr. Collins further concluded to a reasonable degree of medical certainty that the manner of death was homicide. He submitted the two bullets recovered from McCoy's body to the Firearms Identification Unit.

\* \* \*

Detective John Cahill was assigned to investigate this homicide. At approximately 2:15 a.m., Detective Cahill responded to the crime scene with Detective Ted Hagan. On June 4, 2008, Detective [James] Dunlap assisted with the recovery of surveillance footage from the digital video recording player at the bar. He found a total of eight video cameras around the interior and exterior of the bar. . . . Camera Number 5 was an exterior camera located on the front of the property at the southwest corner of 15th and Pike Streets, and viewed the 1500 block of Pike Street westbound. Camera Number 6 was located outside the entrance door at 15th and Pike Streets and viewed the

southwest corner of 15th and Pike Streets. Camera Number 7 viewed the sidewalk on Pike Street. . . .

Detective Dunlap checked the operability of the video recording player and determined that it was functioning properly. When he checked the time, Detective Dunlap observed that it was military time and discovered that it was nine minutes faster than the actual time determined by the U.S. Naval Observatory. Detective Dunlap downloaded all eight camera views, copied them onto a digital video disc, and gave it to the assigned detective. Detective Dunlap recovered a one-half hour block of video running on June 3, 2008 from 23:20 to 23:50 (11:20 p.m. to 11:50 p.m.). He also recovered one fifty-minute block of video from 22:30 to 23:20 (10:30 p.m. to 11:20 p.m.) from Camera Numbers 5 and 6, both exterior cameras. Camera Number 5 had the best camera view of the incident. Because multiple camera views could not be shown at once, Detective Dunlap used software to copy and compile camera views into one running video.

The first video clip was recorded at 23:29:36 from Camera Number 5 and displayed a male and female entering a white Malibu several feet from the corner. The next video clip showed two men riding bicycles on Pike Street traveling toward 15th Street. The two men rode past the camera and turned southbound onto 15th Street, where they were recorded by Camera Number 6. The men were out of the camera's view when they traveled up Pike Street. The subsequent video clip came from Camera Number 5 and showed bicycles crossing the street. One bicycle rode onto the curb to the driver side of the white Malibu and the other bicycle rode to the passenger side. Someone was inside the vehicle because the brake lights were lit. At 23:40 and 23:41, someone was at the driver's side of the vehicle. A man wearing a striped shirt exited the vehicle, but then went back inside the vehicle.

The video then showed one of the men running away. At the scene, the passenger door was open and a person and an object were on the ground. At that time, people started to exit the bar and gather into a large crowd. Police then arrived and secured the scene. In addition to compiling these several camera views, Detective Dunlap

took 130 still photographs from the video. These still photographs accurately depicted the views from Camera Number 5 and Camera Number 6.

After reviewing this video, Detective Hagan returned to Lid's Pike Bar and interviewed Jarita Capehart [("Capehart")] at or about 12[:00] noon on June 4, 2008. The video displayed Capehart walking westbound on the 1500 block of Pike Street prior to the murder. During this interview, Capehart did not appear to be under the influence of drugs or alcohol. After reviewing her five-page statement, Capehart signed it. Capehart was interviewed a second time by Detective Cahill on June 6, 2008. During this interview, Detective Cahill learned that [Appellant] was her cousin and that his nickname was "Gold." Capehart knew co-defendant as "Vito." Detective Cahill learned that, on the evening of the murder, [Appellant] and co-defendant were at Capehart's residence, which was approximately one and one-half blocks away from Lid's Pike Bar. She told Detective Cahill that [Appellant] and co-defendant were in front of her house when she left to go to the bar at 8:45 p.m. Co-defendant was wearing cargo shorts and a red or burgundy shirt. [Appellant] was wearing a white shirt, tan cargo pants[,] and a bulletproof vest. Co-defendant had a red bicycle and [Appellant] had a blue and pink bicycle. The day before giving this statement, Capehart had seen the blue and pink bicycle in front of her house, but she had not seen the red bicycle since the shooting.

Capehart left the bar at about 11:30 p.m. When she arrived home, she saw [Appellant's] brother, Durrell, who told her that he heard gunshots. Capehart then went upstairs and called a friend who was still at the bar. Capehart's friend informed her that it was McCoy who had been shot. When Capehart went back downstairs, she encountered [Appellant] and Durell at her front door. [Appellant] told her that he was leaving because too many police were around. Finally, Capehart stated that she had not seen [Appellant] or co-defendant since the murder. Capehart did not appear to be under the influence of drugs or alcohol during this second interview. After reviewing her eight and one-half page statement, Capehart signed it. She identified co-defendant after being shown a

photographic array. She also identified [Appellant] after being shown a photograph.

On June 10, 2008, Detective Hagan interviewed Naja McCoy and took her statement. Ms. McCoy informed Detective Hagan that McCoy was her blood cousin, but that she considered him her brother because they were raised in the same household. Ms. McCoy also knew [Appellant] because she grew up with him in the neighborhood. She knew [Appellant's] nickname to be "Gold." Ms. McCoy told Detective Hagan that she spent a lot of time at Capehart's residence because she was best friends with Lekita Gilliard ("Kita"), who is [Appellant's] sister. Ms. McCoy was also the godmother to two of Kita's children. About every other year, she helped Kita buy bicycles for the children. As a result, bicycles were always on the porch. However, after the murder, the bicycles were missing.

Ms. McCoy also told Detective Hagan that she went to Capehart's residence on June 3, 2008, between 3:30 p.m. and 4:30 p.m. When she arrived, she saw [Appellant], who was wearing a dark hooded sweatshirt, white tee-shirt[,] and dark jeans. After she hugged [Appellant], he showed her that he was also wearing a bulletproof vest. She asked him why he was wearing it, and he told her that he was being careful because he took a chrome gun from "El Boog" during an incident on Erie Avenue. As she was leaving Capehart's residence at or before 5:00 p.m., [Appellant] introduced Ms. McCoy to [co-defendant], who identified himself as "Vito." This was the first and last time that she saw co-defendant. It was also the last time that she saw [Appellant]. At trial, Ms. McCoy confirmed that she had a conversation with Tyree Chandler [("Chandler")] after the murder. Ms. McCoy further testified that she reviewed her four-page statement and signed it. She also signed and dated photographs of co-defendant and [Appellant], which were attached to her statement.

On June 10, 2008, Detective Cahill interviewed Fields, who had been in a relationship with McCoy for two years. Detective Cahill first met Fields at the homicide unit and delayed interviewing her because she was crying and hysterical. In her statement, Fields described the two men who approached McCoy's vehicle. The man who

- 6 -

approached the driver's side was a bearded, brown-skinned black male in his twenties who was approximately six feet and one inch tall. This man was wearing a black hoodie and a white tee-shirt, and she saw a tattoo on the top of the man's right hand when he grabbed the gun. She described the man on the passenger side of the vehicle as being between 18 to 20 years old with light brown skin and a scruffy beard. This man was wearing tan khaki pants and a gray hoodie. After the interview, she reviewed her three-page statement and signed it.

After being shown a photographic array, Fields identified Johnson as the man who stood on the passenger side of the vehicle. **She next identified [Appellant] as the man who approached the driver's side of the vehicle. These identifications were signed and attached to her statement. At trial, Fields stated that she was certain of her identifications.**

During this interview, Detective Cahill showed Fields the signed statement she provided to Detective Knecht[6] . . . at 12:52 a.m. on June 4, 2008. She reviewed this statement and corrected one minor typographical error. No other corrections were made. At trial, she stated that she tried to answer the detective's questions to the best of her ability, but that there were a few inaccurate statements in that document. Fields denied stating that the man who approached the driver's side of the vehicle did not have a gun. During her interview with Detective Knecht and at trial, Fields stated that this was incorrect because [Appellant] did possess a gun during this incident. She also denied stating [Appellant's] height as [between five-feet seven inches and five-feet nine inches] tall because he was the same height as McCoy, who was about six feet tall. Fields testified at [Appellant's] preliminary hearing. At the preliminary hearing, Fields identified Johnson as the man who was at the passenger side of the vehicle trying to pick up the red bicycle.

---

[6] Our review of the record did not reveal the detective's first name.

On June 10, 2008, Sergeant William Britt assigned Detectives Burke and Rocks[7] to search for [Johnson and Appellant] as fugitives. On June 13, 2008, based on information received, Sergeant Britt and several officers went to 3731 North 16th Street, where they found Chandler. Chandler was subsequently transported to the homicide unit, where he was interviewed. Detective [Joseph] Bamberski testified that two warrants had been issued for Chandler to appear as a witness by the time of trial. Despite law enforcement's efforts to locate Chandler, he has not been seen since June 13, 2008, when he provided a signed statement.

Based on Chandler's interview, Sergeant Britt and members of the U.S. Marshals Fugitive Task Force went to the area of 24th and Norris Streets. During their surveillance, they observed Johnson riding a bicycle northbound on 24th Street toward Diamond Street. They pursued him, but then lost him when he fled into a public housing authority development. On June 14, 2008, Sergeant Britt and members of the U.S. Marshals Fugitive Task Force went to Apartment 905 at 4455 Holden Street based on information received. When they arrived, they found and arrested co-defendant and [Appellant]. . . .

Trial Ct. Op., 12/17/13, at 2-4, 6-13 (footnotes, citations, and some appellations such as "Mr." and "Ms." omitted, and emphasis added).

Appellant was convicted following a jury trial and sentenced to life imprisonment without the possibility of parole for second degree murder and a concurrent sentence of ten to twenty years' imprisonment for the robbery conviction. He received consecutive sentences of ten to twenty years' imprisonment for conspiracy to commit murder and two and one-half to five years for carrying a firearm on public streets in Philadelphia. Appellant filed

---

[7] Our review of the record did not reveal the detectives' first names.

a timely post-sentence motion, which was denied, and then the instant appeal. Appellant filed a court-ordered Pa.R.A.P. 1925(b) statement of errors complained of on appeal[8] and the trial court filed a responsive opinion.

Appellant claims that the court erred in denying his motion for a new trial based on the weight of the evidence.[9] Appellant's Brief at 17. He avers that Fields gave two different descriptions of the male who came to the driver's side of the vehicle with respect to his height and facial hair. *Id.* at 16. Appellant states that Fields initially identified Angelo Rios ("Rios") as having been involved in the shooting. *Id.* He contends the verdict was against the weight of the evidence because it was based solely upon the inconclusive testimony of the lone eyewitness to the shooting.[10] *Id.* at 17. We find no relief is due.

---

[8] We note that Appellant was ordered to file a Rule 1925(b) statement no later than twenty-one days from September 3, 2013, which was September 24th. Appellant filed his Rule 1925(b) statement on October 15, 2013. This Court has stated that where the trial court addresses the issues raised in an untimely 1925(b) statement, we can address the merits of the appeal without a remand. *Commonwealth v. Fischere*, 70 A.3d 1270, 1275 n.2 (Pa. Super. 2013), *appeal denied*, 83 A.3d 167 (Pa. 2013).

[9] Appellant preserved this issue in his post-sentence motion. *See* Post Sentence Mot., 3/11/13, at 1 (unpaginated).

[10] We note with displeasure that the argument section of Appellant's brief spans three pages, consisting primarily of a recitation of the facts. The sole legal authority cited is two civil cases, without pinpoint citation, for the standard of review. We remind counsel:

Our Supreme Court has held that

> [a] motion for a new trial alleging that the verdict was against the weight of the evidence is addressed to the discretion of the trial court. An appellate court, therefore, reviews the exercise of discretion, not the underlying question whether the verdict is against the weight of the evidence. The factfinder is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. The trial court will award a new trial only when the jury's verdict is so contrary to the evidence as to shock one's sense of justice. In determining whether this standard has been met, appellate review is limited to whether the trial judge's discretion was properly exercised, and relief will only be granted where the facts and inferences of record disclose a palpable abuse of discretion. Thus, the trial court's denial of a motion for a new trial based on a weight of the evidence claim is the least assailable of its rulings.

*Commonwealth v. Ramtahal*, 33 A.3d 602, 609 (Pa. 2011) (citations omitted).

Section 2502(b) of the Crimes Code defines second degree murder:

---

> [I]t is an appellant's duty to present arguments that are sufficiently developed for our review. The brief must support the claims with pertinent discussion, with references to the record and with citations to legal authorities. *Id.*; Pa.R.A.P. 2119(a), (b), (c). Citations to authorities must articulate the principles for which they are cited. Pa.R.A.P. 2119(b).
>
> This Court will not act as counsel and will not develop arguments on behalf of an appellant. Moreover, when defects in a brief impede our ability to conduct meaningful appellate review, we may dismiss the appeal entirely or find certain issues to be waived. Pa.R.A.P. 2101.

*Commonwealth v. Hardy*, 918 A.2d 766, 771 (Pa. Super. 2007) (some citations omitted). Because we are able to conduct meaningful appellate review, we decline to find the issue waived. *See id.*

> **(b) Murder of the second degree.**— A criminal homicide constitutes murder of the second degree when it is committed while defendant was engaged as a principal or an accomplice in the perpetration of a felony.

18 Pa.C.S. § 2502(b).

Section 3701(a)(1)(i) of the Crimes Code defines robbery.

> **(a) Offense defined.—**
>
> (1) A person is guilty of robbery if, in the course of committing a theft, he:
>
> (i) inflicts serious bodily injury upon another.

18 Pa.C.S. § 3701(a)(1)(i).

The trial court opined:

> [Appellant] alleges that Fields initially identified another individual as the perpetrator. This is not exactly what happened. Immediately after the shooting, police drove Fields around the area to search for the shooters. While Fields was in the police vehicle, she described one of the perpetrators. During their surveillance, police stopped Rios. When police asked Fields whether Rios was one of the perpetrators, she did not make an identification. She merely indicated that Rios was wearing similar clothing as the perpetrator. . . .
>
> [Appellant] also points out that the initial description that Fields provided to police did not match [Appellant]. When Fields was first questioned by police, she described the man who stood on the driver's side of McCoy's vehicle as a tall black male wearing a hoodie and white shirt. She also described the man as being between five feet and seven inches and five feet and nine inches tall. In her second statement to police, she described the perpetrator as a black male who was about six feet and one inch tall, the same height as the victim. At trial, Fields did not recall providing the earlier description to police. She was certain that the man who stood on the driver's side was about six feet and one inch tall. . . .

After her initial interview, Fields positively identified [Appellant] on three different occasions. First, she identified [him] in her statement to homicide detectives. She described the man who approached the driver's side as a bearded, brown-skinned black male in his twenties who was approximately six feet and one inch tall. This man was wearing a black hoodie and a white tee-shirt, and she saw a tattoo on the top of the man's right hand when he grabbed the gun. After being shown a photographic array, Fields identified [Appellant] as the man who approached the driver's side of the vehicle. . . .

Fields subsequently identified [Appellant] at a preliminary hearing. She also identified [him] at trial, where she stated that she was certain of her identifications. . . .

Trial Ct. Op. at 20-22 (citations and footnote omitted).

The trial court concluded Appellant's claim that the verdict was against the weight of the evidence was meritless. *Id.* at 24. We agree. Appellant asks this Court to reweigh the evidence and find that the evidence that inculpated him was not credible. This we cannot do. *See Ramtahal*, 33 A.3d at 609. Instantly, Fields identified Appellant in a statement to homicide detectives, at a preliminary hearing, and at trial with certainty. The jury was free to believe all, part or none of the evidence. *See id.* The jury's verdict was "not so contrary to the evidence as to shock one's sense of justice." *See id.* We discern no abuse of discretion by the trial court. *See id.*

Lastly, we *sua sponte* raise the issue of the legality of Appellant's sentence. *See Commonwealth v. Provenzano*, 50 A.3d 148, 157 (Pa. Super. 2012), (citation omitted). Appellant received the same sentence as

his co-defendant, Johnson. Johnson, on direct appeal, raised the issue of the legality of his sentence. ***Johnson***, 213 EDA 2013 at 10. In ***Johnson***, this Court opined:

> [B]ecause [the a]ppellant's conviction for robbery should have merged with his second degree murder conviction for purposes of sentencing, [his] sentence was illegal. . . .
>
> "A claim that crimes should have merged for sentencing purposes raises a challenge to the legality of the sentence." ***Commonwealth v. Quinta***, 56 A.3d 399, 400 (Pa. Super. 2012), *appeal denied*, 70 A.3d 810 (Pa. 2013) (citation omitted). "An illegal sentence must be vacated. . . ." ***Commonwealth v. Mendozajr***, 71 A.3d 1023, [1027] (Pa. Super. 2013). . . .
>
> [T]he robbery conviction should have merged with the second-degree murder conviction. ***See*** 42 Pa.C.S. § 9765; ***cf. Commonwealth v. Adams***, 39 A.3d 310, 325 (Pa. Super. 2012) . . . (underlying felony merges with second-degree murder). Therefore, we will vacate [the a]ppellant's sentence with respect to the robbery conviction.
>
> As [the a]ppellant's sentence for robbery was concurrent with his mandatory life imprisonment sentence for second-degree murder, this vacatur does not upset the sentencing scheme and, therefore, does not require remand. ***See Commonwealth v. Lomax***, 8 A.3d 1264, 126[8-69] (Pa. Super. 2010). . . .

***Id.*** at 20-21.

In the case *sub judice*, the Commonwealth states that the sentence for robbery should have merged with the sentence for second degree murder. Commonwealth's Brief at 12 n.4. We agree. Appellant's robbery conviction merges with his second degree murder conviction. Therefore, we vacate

Appellant's sentence with respect to the robbery conviction.  **See Johnson**, 213 EDA 2013 at 20-21.

Judgment of sentence as to Appellant's conviction for violation of 18 Pa.C.S. § 3701(a)(1)(i) vacated.  Judgment of sentence affirmed in all other respects.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/23/2014