COMMONWEALTH of Pennsylvania,
Appellee

v.

Stephen FISCHERE, Appellant.

Superior Court of Pennsylvania.

Argued April 9, 2013.
Filed July 16, 2013.

Steven M. Papi, Media, for appellant.

Jay W. Hannon, Assistant District Attorney, Media, for Commonwealth, appellee.

BEFORE: STEVENS, P.J., FORD ELLIOTT, P.J.E., BOWES, GANTMAN, PANELLA, SHOGAN, LAZARUS, MUNDY, and OTT, JJ.

OPINION BY MUNDY, J.:

Appellant, Stephen Fischere, appeals from the October 14, 2010 aggregate judgment of sentence of 10 to 20 years' imprisonment imposed after he was found guilty of aggravated assault and endangering the welfare of a child.[1] After careful review, we affirm.

The trial court summarized the relevant facts of this case as follows.

On the evening of April 28, 2009, the Aldan Borough Police Department responded to a 911 call at 110 West Maryland Avenue, the residence of Barbara Grogan and [Appellant]. The call was received at approximately 6:40 P.M., and Sergeant James Fink, who was on duty that evening and already in the area, arrived on location within minutes of the call. Upon arrival, [Appellant] was observed outside of the residence. [ ] Appellant appeared upset and directed Sergeant Fink into the downstairs apartment, which belonged to his neigh-

1. 18 Pa.C.S.A. §§ 2702(a)(1) and 4304(a)(1), respectively.

bor, Amber Graff–Eder, and where a small child, (herein after referred to as Z.G.), was observed lying on the living room floor. Z.G. appeared to be unresponsive, but upon closer observation was observed to be breathing shallowly. Sergeant Fink then briefly left the residence to obtain his CPR mask, which was located outside in his patrol vehicle. Sadly, by the time he returned, Z.G. was no longer breathing.

In an effort to resuscitate the child, Sergeant Fink placed his CPR mask on Z.G. and administered two breaths. By this time, Éric Davis, an EMT with Fitzgerald Mercy Hospital, had arrived on the scene and instructed Sergeant Fink to take Z.G. to the ambulance which he had parked outside of the residence. Sergeant Fink did as instructed, and Z.G. was transported to Fitzgerald Mercy Hospital for further care.

At the hospital, Maureen McCullian, a nursing supervisor on duty that evening, was told by Sergeant Fink and Eric Davis that the child had fallen down some steps. Ms. McCullian found this explanation to be at odds with the severity of the injuries and condition of the child upon his arrival to the hospital. Dr. Michelle Azer, who was also on duty at the hospital that evening, was called to the emergency room upon Z.G.'s arrival. Dr. Azer arrived to the emergency room at approximately 7:00 P.M., and, despite the efforts of herself and her medical staff, was unable to get the child's heart started.

At Appellant's [jury] trial [on July 19, 2010], Dr. Azer described the emergency room as chaotic, and relayed to the jury that she too was told that the child had fallen down five to six stairs. Dr. Azer explained that she had never before seen cardiac arrest from a fall down several stairs. Both Ms. McCullian and Dr. Azer observed bruises on the child's body.

On the day of the incident, Barbara Grogan, Z.G.'s mother, was working at a local diner. Her friend Tamera had driven her to work and had then taken Barbara's two children, Z.G. and X.G., back to Tamera's house. Upon the conclusion of her shift, Barbara was to be picked up by her boyfriend, [ ] Appellant, after he himself finished work. In addition to giving Barbara a ride to work, Tamera had also agreed to watch Barbara's children until [ ] Appellant finished work and was able to pick them up. Appellant did retrieve the children from Tamera's home around 5:15 that evening and then returned to the apartment he and Barbara shared at 110 West Maryland Avenue, mentioned above.

That evening Barbara received a call to her cell phone around 6:00 P.M., but could not answer the call while she was working. Later a call was made to her workplace, and Barbara was informed that her oldest son, Z.G., had been rushed to the hospital. Barbara was given a ride to the hospital and waited in an interview room while Z.G. was treated by the medical staff at the hospital. Shortly thereafter Barbara was informed by the doctor that, despite the doctors' efforts, her son Z.G. did not survive.

Following this incident, detectives William Gordon and Thomas Worrilow Jr., of the Delaware County Criminal Investigation Division, commenced an investigation into the cause of Z.G.'s death. Appellant, who was the last person to see Z.G. alive, recounted the events leading up to his death and explained that prior to the incident[,] Z.G. had been eating a donut. He stated that he had been gathering the children's belongings before heading to his brother's home, where he intended to stay until Barbara's shift was over. Appel-

lant explained that he had been preoccupied and that tragically, Z.G. had tripped over a seatbelt that had been hung over a railing and had fallen down the stairs. He explained that when he ran to Z.G.'s aid he was not breathing. Appellant explained that he performed CPR and then ran to his neighbor's apartment and asked her to call 911.

Following Z.G.'s death, an autopsy was performed by Delaware County's Chief Medical Examiner, Dr. Frederick Hellman. Dr. Hellman concluded that the manner of death was homicide caused by multiple blunt force trauma to various parts of his body and high neck subluxation. Dr. Hellman, in his professional opinion, did not believe that Z.G.'s injuries were consistent with the story provided by Appellant. Similarly, Dr. Lucy Rourke–Adams, a pediatric neuropathologist at Children's Hospital of Philadelphia, who examined several of the child's organs following his death, also found it unlikely that Z.G.'s injuries could have been caused by a fall down the steps.

In the case *sub judice*, the Commonwealth argued that there were preexisting bruises on Z.G. before the incident on April 28, 2009. The Commonwealth contended that these bruises were not the result of any sort of bruising disorder, but had been inflicted upon the child by the Appellant. The Commonwealth maintained that, on the night of the incident, Appellant had beaten the child to death, and the Commonwealth suggested that the bruising on the child was illustrative of this abuse. In order to establish this theory, the Commonwealth called several medical professionals at trial, some of whom had seen the child arrive at the emergency room on April 28, 2009[,] and some of whom had examined the child in the days leading up to and following his death. These witnesses included Dr. Richard Kaplan,

Z.G.'s pediatrician; Dr. Michelle Azer, who was on duty in the emergency room on April 28, 2009 when Z.G. was brought in and unresponsive; Dr. Lucy Rourke–Adams, a pediatric neuropathologist at Children's Hospital of Philadelphia who examined Z.G. following his death, and Dr. Fredrick Hellman, the Chief Medical Examiner in Delaware County.

Additionally, the Commonwealth introduced pre-autopsy photographs of Z.G. to illustrate the condition of his body following the incident. Several of these photographs were shown to Barbara and Tamera during direct examination. Additional photographs were also shown to several of the medical professionals mentioned above, including Dr. Hellman. Several photographs were also shown to the jury during the trial and again during deliberations.

As set forth above, Tamera Campanese, Barbara's best friend, had spent the day caring for Z.G. and his brother on April 28, 2009. At trial Tamera testified that Z.G. seemed happy and had been playing outside in a small pool with her daughter that day. At trial Tamera was shown the pre-autopsy photographs of Z.G. Tamera testified that she did not recall seeing any unusual marks on Z.G.'s body that day.

Barbara was also shown several pre-autopsy photographs at trial. When shown these photographs, Barbara testified that she had not seen the bruising illustrated in the photographs on Z.G. before. On cross-examination, Barbara testified that she had seen some bruising around the child's penis about a week prior to the incident, but explained that it did not look anything like the bruising in the photographs. Barbara explained that she had noticed excessive bruising on Z.G. and, although she claimed she had directly observed the resultant bruises from various bumps and blun-

ders, she was "concerned[ ] when they just started popping up like all over the place."

Dr. Richard Kaplan, the child's pediatrician, reported that, because of Barbara's concern over these bruises, tests had been performed on Z.G. several days before the day of his death to determine whether the child had a bruising disorder. The results of this test came back normal. Additionally, after tests were conducted on the child post mortem, the medical examiner, Dr. Hellman concluded that several of the bruises observed on Z.G.'s body had been inflicted anywhere from one hour to four hours before the child's death.

Dr. Hellman explained his findings in great detail at trial, and recounted that in addition to the bruises observed on the child's body, Z.G. had injuries to several of his organs, including his liver and spleen. Z.G. also had a subluxation, or "a loosening to tearing of the ligaments between the vertebrae and the spine", in his upper neck bone between the base of his skull and his first cervical vertebrae. Dr. Hellman explained that this type of injury occurs as a result of "considerable force." He explained that there was no bleeding observed at this site, but stated that he did find blood in Z.G.'s peritorial cavity, which he found to be unusual based upon the circumstances that were alleged to have surrounded the child's death.

Trial Court Opinion, 7/20/11, at 1–6 (citations and footnotes omitted).

Additionally, during the Commonwealth's case in-chief, defense counsel's cross-examination of Detective William Gordon raised "the inference that [Detective Gordon] did not ask enough or did not ask the proper questions of [Appellant] during the interview which took place at the hospital[.]" N.T., 7/22/10, at 125.

Detective Gordon and Detective Thomas Worrilow took Appellant's initial statement at the hospital on April 28, 2009. Later that night, Detective Gordon spoke to Dr. Azer who informed the detectives that Appellant's statement was inconsistent with the injuries on Z.G.'s body. *Id.* at 128. Detective Gordon then returned to Appellant for another interview, at which time, Appellant declined to answer any more questions without first speaking to an attorney. *Id.*

After defense counsel finished cross-examining Detective Gordon, the Commonwealth asked the trial court for a ruling that if Appellant were to testify, the Commonwealth would be permitted to cross-examine him using his pre-arrest silence with regard to Detective Gordon's request for a second interview. The Commonwealth argued it would be permitted to do so as a fair response to the inferences raised by defense counsel during Detective Gordon's cross-examination. The trial court agreed.

While conducting a colloquy with Appellant on his constitutional right to testify, the trial court instructed Appellant that, if he did testify, the jury would be instructed that they could consider evidence of his pre-arrest silence only "to help [it] judge the credibility and weight of the testimony by [Appellant] at trial." N.T., 7/26/10, at 18. The trial judge would also instruct the jury that it "must not be considered . . . as nay [sic] evidence or indication of Appellant's guilt." *Id.* at 17. Appellant acknowledged that he understood his rights. *Id.* at 20. After which, he elected not to testify in his own defense. *Id.* at 20.

At the conclusion of the trial, the jury found Appellant guilty of aggravated assault, and endangering the welfare of a minor. On October 14, 2010, the trial court imposed an aggregate judgment of sentence of 10 to 20 years' imprisonment.

Appellant did not file any post sentence motions. On November 9, 2010, Appellant filed a timely notice of appeal.[2]

On May 14, 2012, a divided panel of this Court affirmed Appellant's judgment of sentence, concluding that Appellant's constitutional rights would not have been violated had the Commonwealth cross-examined Appellant on his pre-arrest silence. On May 25, 2012, Appellant filed a petition for reargument *en banc*. This Court granted Appellant's petition on July 13, 2012, and the previous panel opinion was withdrawn.

In his substituted brief on reargument, Appellant raises one issue for our review.

Whether the trial court erred in ruling that the Commonwealth would be permitted to cross-examine [Appellant] regarding his pre-arrest silence if he testified, thus preventing him from taking the stand in his own defense?

Appellant's Brief at 4.

 Appellant avers that the trial court erred in ruling that the Commonwealth could cross-examine him using evidence of his pre-arrest silence if he were to testify. *Id.* at 8. Our standard of review regarding evidentiary issues is well set-tled. "The admissibility of evidence is at the discretion of the trial court and only a showing of an abuse of that discretion, and resulting prejudice, constitutes reversible error." *Commonwealth v. Sanchez*, 614 Pa. 1, 36 A.3d 24, 48 (2011) (citations omitted), *cert. denied*, —— U.S. ——, 133 S.Ct. 122, 184 L.Ed.2d 58 (2012). "An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record." *Commonwealth v. Hanford*, 937 A.2d 1094, 1098 (Pa.Super.2007) (citation omitted), *appeal denied*, 598 Pa. 763, 956 A.2d 432 (2008). Furthermore, "if in reaching a conclusion the trial court overrides or misapplies the law, discretion is then abused and it is the duty of the appellate court to correct the error." *Commonwealth v. Weakley*, 972 A.2d 1182, 1188 (Pa.Super.2009) (citation omitted), *appeal denied*, 604 Pa. 696, 986 A.2d 150 (2009).

 We begin by noting, "[b]oth the Fifth Amendment of the United States Constitution and Article I, Section 9 of the

---

2. The trial court ordered Appellant to file a Rule 1925(b) statement on November 16, 2010. The statement was due 21 days from the date of this filing, on December 7, 2010. On December 6, 2010, Appellant requested an extension of time to file a concise statement in accordance with Rule 1925(b). On December 8, 2010, the trial court granted Appellant an extension until December 27, 2010. Appellant's Rule 1925(b) statement was not filed until December 28, 2010. Our Supreme Court has recently held that "Rule 1925(b) sets out a simple bright-line rule, which obligates an appellant to file and serve a Rule 1925(b) statement, when so ordered[.]" *Commonwealth v. Hill*, 609 Pa. 410, 16 A.3d 484, 494 (2011).

However, this Court has held that failure to timely file a Rule 1925(b) statement is the equivalent of a failure to file said statement. *Commonwealth v. Thompson*, 39 A.3d 335, 340 (Pa.Super.2012), *citing Commonwealth v. Burton*, 973 A.2d 428, 433 (Pa.Super.2009) (*en banc*). Both failures constitute *per se* ineffective assistance of counsel, which in criminal cases ordinarily requires a remand for the filing of a Rule 1925(b) statement pursuant to Pa.R.A.P. 1925(c)(3). *Id.* However, this Court held "[w]hen counsel has filed an untimely Rule 1925(b) statement and the trial court has addressed those issues we need not remand and may address the merits of the issues presented." *Id.* On July 20, 2011, the trial court issued its Rule 1925(a) opinion, accepting Appellant's untimely Rule 1925(b) statement, and addressing the issue Appellant now raises before this Court. Therefore, pursuant to this Court's holding in *Thompson*, we may address the merits of Appellant's claim.

Pennsylvania Constitution protect an individual's right not to be compelled to be a witness against himself." *Commonwealth v. Lettau,* 604 Pa. 437, 986 A.2d 114, 117 (2009) (citation omitted). The right to remain silent is grounded in the United States Supreme Court's decision in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The Fifth Amendment also protects a defendant's decision to not testify at trial from being commented on by the prosecution to the jury.[3] *Griffin v. California,* 380 U.S. 609, 612, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965).

■ However, the Supreme Court has recognized that it does not violate the Fifth and Fourteenth Amendments when the prosecution uses a defendant's pre-arrest silence if he or she testifies in his or her own defense. *Jenkins v. Anderson,* 447 U.S. 231, 238, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980). In *Commonwealth v. Bolus,* 545 Pa. 103, 680 A.2d 839 (1996), our Supreme Court found the reasoning in *Jenkins* persuasive.

> We ... hold that when a criminal defendant waives his right to remain silent and testifies at his own trial, neither the United States nor the Pennsylvania Constitution prohibit a prosecutor from impeaching a defendant's credibility by referring to his pre-arrest silence.

*Id.* at 844. It therefore appears, at least from *Bolus* and *Jenkins,* that there is no constitutional limit on the Commonwealth's ability to impeach a criminal defendant's own testimony with evidence of his or her pre-arrest silence. Furthermore, our Supreme Court has held "there is no Fifth Amendment proscription precluding the raising of silence in fair response to defense argumentation." *Commonwealth v. DiNicola,* 581 Pa. 550, 866 A.2d 329, 335 (2005), *citing United States v. Robinson,*

485 U.S. 25, 32, 108 S.Ct. 864, 99 L.Ed.2d 23 (1988).

However, when a defendant does not testify, the Commonwealth's use of his or her pre-arrest silence is more restricted. In *Commonwealth v. Molina,* 33 A.3d 51 (Pa.Super.2011) (*en banc*), *appeal granted in part,* 616 Pa. 547, 51 A.3d 181 (2012), the appellant was charged with third-degree murder and did not testify in his own defense at trial. *Id.* at 53. Appellant specifically objected to the following commentary made as part of the Commonwealth's summation.

> Look also at what happened in terms of the police investigation in this matter. Three days after [the victim] goes missing, three days after she goes missing, detectives are already knocking on [Appellant's] door because of something they heard, maybe he was holding this person against [her] will, and he calls the police back and is very defensive. I mean, before a question's even asked, he denied any knowledge or any involvement with this young lady. He makes contradictory statements to the police about when's the last time that he saw her. First he says, "I saw her a year and a half ago." Then he says, "I saw her three months ago." *But most telling, I think, is the fact that the [detective] invited him. "Well, come on down and talk to us. We want to ask you some more questions about this incident, your knowledge of this young lady," especially because he made these contradictory statements. And what happens? Nothing happens. He refuses to cooperate with the Missing Persons detectives. And why?*

*Id.* at 55 (internal citations omitted; emphasis in original). The trial court overruled appellant's objection, and a curative

---

3. We note that the Fifth Amendment's protection against self-incrimination applies to the States via the Due Process Clause of the Fourteenth Amendment. *Maryland v. Shatzer,* 559 U.S. 98, 103, 130 S.Ct. 1213, 175 L.Ed.2d 1045 (2010).

instruction was refused by the trial court. Thereafter, the Commonwealth stated to the jury, "[f]actor that in when you're making an important decision in this case as well." *Id.* On appeal, the *Molina* Court concluded that the Commonwealth's use of the appellant's pre-arrest silence violated his constitutional rights, stating as follows.

> [T]he [Commonwealth] may not use [pre-arrest] silence as substantive evidence of guilt when a defendant chooses not to testify, and such use should not be limited to "persons in custody or charged with a crime"; rather, it may also not be used against a defendant who remained silent during the investigation of crime.

*Id.* at 63. The *Molina* Court, however, did not address the issue of whether the Com-

monwealth may nevertheless use a non-testifying defendant's pre-arrest silence if the defendant opens the door.[4]

■ Recently, however, this Court addressed that very issue in *Commonwealth v. Adams*, 39 A.3d 310 (Pa.Super.2012), *appeal granted*, 616 Pa. 437, 48 A.3d 1230 (2012). In *Adams*, the appellant was charged with second-degree murder and various other crimes. *Id.* at 311. The appellant objected to the following exchange during the Commonwealth's case.

> Assistant District Attorney: During your investigation, did you have the occasion to locate [Appellant]?
>
> Sergeant Gretsky: Yes.
>
> . . .
>
> Assistant District Attorney: And did you attempt to interview [Appellant]?

---

4. On January 18, 2013, the United States Supreme Court granted the defendant's petition for a writ of *certiorari* to the Court of Criminal Appeals of Texas in *Salinas v. Texas*, —— U.S. ——, 133 S.Ct. 2174, 186 L.Ed.2d 376 (2013). The Court granted *certiorari* in order "to resolve a division of authority in the lower courts over whether the prosecution may use a defendant's assertion of the privilege against self-incrimination during a noncustodial police interview as part of its case in chief." *Id.* at 2179. The Court of Criminal Appeals of Texas held that the state may comment on a defendant's pre-arrest, pre-*Miranda* silence at trial as substantive evidence of guilt. *Salinas v. State*, 369 S.W.3d 176, 179 (Tex.Crim.App.2012), *affirmed, Salinas v. Texas*, —— U.S. ——, 133 S.Ct. 2174, 186 L.Ed.2d 376 (2013). Had the Supreme Court agreed with the Texas Court of Criminal Appeals' analysis, this would have abrogated this Court's decision in *Molina*.

However, on June 17, 2013, the Supreme Court affirmed the Texas Court of Criminal Appeals on a different rationale. The Court concluded that Salinas did not sufficiently invoke his right to silence in the first place, so it need not consider the broader constitutional question presented. *Salinas, supra* at 2179. The Supreme Court held that the defendant was required to "expressly invoke" his Fifth Amendment privilege. *Id.* at 2178. Al-

though the Court reaffirmed that "no ritualistic formula is necessary in order to invoke the privilege," the Court also held that "a witness [cannot] do so by simply standing mute." *Id.*, *quoting Quinn v. United States*, 349 U.S. 155, 164, 75 S.Ct. 668, 99 L.Ed. 964 (1955). Because Salinas sat silent when asked one question by the police instead of expressly invoking his Fifth Amendment rights, his claim failed. *Id.* at 2178, 2184.

In the instant case, Appellant neither remained silent nor stood mute. As noted above, he affirmatively informed Detective Gordon that he did not wish to answer any further questions without first speaking to an attorney. N.T., 7/22/10, at 128. Additionally, the *Salinas* Court noted that the purpose of the express invocation requirement was to "ensure[] that the Government is put on notice when a witness intends to rely on the privilege so that it may either argue that the testimony sought could not be self-incriminating, ... or cure any potential self-incrimination through a grant of immunity...." *Salinas, supra* at 2179. This purpose was satisfied in this case. The Commonwealth affirmatively asked the trial court for the ruling allowing it to comment on Appellant's silence, it follows that the Commonwealth was already "put on notice" that Appellant had relied on his Fifth Amendment privilege. *See id.* As a result, *Salinas* does not alter our conclusion in this case.

Sergeant Gretsky: Yes we did; however, he didn't want to speak to us at that time.

Assistant District Attorney: Did you identify yourselves as law enforcement?

Sergeant Gretsky: Yes. We identified ourselves and told him that we'd like to interview him in reference to the [victim's] homicide and that his name came up in the matter.

Assistant District Attorney: And in response to that what did he say?

Sergeant Gretsky: He said he had nothing to say.

Assistant District Attorney: What then—did you have a further conversation with him?

Sergeant Gretsky: Yes. We also asked him to consent to provide us with a DNA sample with the use of a DNA collector at which time he agreed.

*Id.* at 315. The trial court overruled the appellant's objection. During closing arguments, defense counsel offered several reasons to the jury for why the appellant refused to speak to law enforcement. *Id.* The Commonwealth then made its own references to the appellant's pre-arrest silence in its summation.

But [Appellant] takes the odd step. He wants to—police say hey, look, you've been implicated in a murder. You want to talk to us? He doesn't remain silent. He chooses to talk. And he doesn't say you are out of your mind. I was at this party. It was a month later. I'm at this party. I was having a great time all day. I remember it was at Big Tome's house. He didn't say that. He says I don't have anything to say to you. He chooses not to speak and he chose to say that. He didn't choose to say, whoa, I got an alibi. No prison for me. You're not catching me on a murder rap. He says I have nothing to say to you.

*Id.* The *Adams* Court found that the appellant's Fifth Amendment rights were not

violated. *Id.* at 323. We concluded that Sergeant Gretsky's original testimony "was offered for a narrow purpose, namely to demonstrate the nature and focus of the investigation, and as foundational evidence demonstrating how the police came to obtain [the a]ppellant's DNA sample, which was later admitted into evidence at trial." *Id.* at 319. As for the Commonwealth's comments during summation, we found *Molina* distinguishable and concluded the following.

Thus, here, unlike *Molina,* rather than preserving his right to silence, by remaining silent and continuing to object to any reference by the Commonwealth to that silence, Appellant's counsel made a tactical decision to comment on Appellant's pre-arrest silence during closing argument. In opting to comment about his silence, we conclude that Appellant "opened the door" to the Commonwealth making responsive closing remarks about Appellant's silence.

*Id.* at 320. Therefore, pursuant to this Court's ruling in *Adams,* an appellant can open the door to the Commonwealth using his or her pre-arrest silence under the "fair-response doctrine" even when the appellant does not testify.

In the case *sub judice,* during its cross-examination of Detective Gordon, defense counsel engaged in a line of questioning that inquired into whether law enforcement had asked Appellant specific questions when he gave his initial statement to law enforcement on April 28, 2009. Defense counsel wished to raise the inference that the police had failed to conduct a full investigation.

[Defense Counsel]: Did [Appellant] tell you that after he pressed on [Z.G.'s] chest and stomach and he started throwing up and puking that he did it one more time and he picked up [Z.G.] and

ran downstairs to the neighbor's house and she called 911?

[Detective Gordon]: That's correct.

. . .

[Defense Counsel]: When [Appellant] told you that he did it one more time, . . . when [he] picked him and ran downstairs to the neighbor's house, do you know what [Appellant] meant when he said, I did it one more time?

[Detective Gordon]: I would assume that was either mouth-to-mouth or chest or stomach compression.

[Defense Counsel]: Did you ask [Appellant] . . . at that point in time to demonstrate for you how he performed those chest compressions and that breathing?

[Detective Gordon]: I did not, no.

[Defense Counsel]: While you were interviewing [Appellant] did it occur to you that the manner in which he performed CPR may become a relevant factor in this case?

[Detective Gordon]: Not at all.

[Defense Counsel]: You knew when you interviewed [Appellant] that this child had died, correct?

[Detective Gordon]: Correct.

[Defense Counsel]: Before you sat down and spoke to [Appellant] did you have an idea of what it was you wanted to asked [sic] him?

[Detective Gordon]: I just wanted to ask him what happened. Other than that I had no idea what to ask him.

. . .

[Defense Counsel]: You were not aware of how long or how many phone calls were made by [Appellant] from 5:35 p.m., when he came in custody of this child, until 6:40 p.m. when the ambulance was called?

[Detective Gordon]: I did not know how many calls were made, sir.

. . .

[Defense Counsel]: Detective, would you agree with me that one principle of ef-

fective criminal investigation provides that when conducting an investigation one should seek evidence tending to prove guilt, while at the same time seek evidence tending to prove that the accused is not guilty. Because no one should be accused of a crime they did not commit.

[Detective Gordon]: Sir, I don't understand the question.

[Defense Counsel]: Are you familiar with the principle of effective law enforcement?

N.T., 7/22/10, at 98–101, 103. Defense counsel expressly admitted that his purpose in this line of questioning was to show that the police failed to conduct a complete investigation.

[The Court]: . . . I thought I saw where you were going. You were trying to show a deficit or a deficiency in his investigation.

[Defense Counsel]: Absolutely. And he's the lead investigator.

*Id.* at 119.

The Commonwealth explained that after conducting their initial interview with Appellant when he gave his statement, the officers went to speak to Dr. Azer and explained Appellant's version of events. N.T., 7/22/10, at 128. The doctor responded that Appellant's version of events was implausible and inconsistent with the injuries on Z.G.'s body. *Id.* It was then that the police went immediately back to Appellant for a second, presumably tougher interview. *Id.* It was upon being asked for that second interview that Appellant declined to answer any more questions. *Id.* at 128, 130.

Our Supreme Court has held that when these inferences are raised, an appellant has opened the door under the "fair-response doctrine" and the Commonwealth may use evidence of his pre-arrest silence.

*See Commonwealth v. Copenhefer,* 553 Pa. 285, 719 A.2d 242, 252 (1998) (stating an "[a]ppellant may not assert to a jury that on the one hand he was entirely cooperative with investigators but on the other hand not place before that same jury the fact that he belatedly invoked his right to remain silent to refuse to answer the most incriminating questions put to him[ ]"), *cert. denied, Copenhefer v. Pennsylvania,* 528 U.S. 830, 120 S.Ct. 86, 145 L.Ed.2d 73 (1999); *see also DiNicola, supra* (stating that an appellant's pre-arrest silence can be used in fair response to "trial counsel's strategy ... question[ing] the government's preparation of its case"). In this case, Appellant is asserting to the jury, albeit implicitly, that he was cooperative when he voluntarily spoke to police on April 28, 2009. However, Appellant also does not want the jury to know that on the same night he refused to give a second interview, where the police would have undoubtedly asked more incriminating questions. As noted above, our cases simply do not allow Appellant to have it both ways.

 Our inquiry, however, does not end here. In order for evidence of pre-arrest silence to be admissible, it is not enough that defense counsel opened the door. As our Supreme Court noted, in order for the Commonwealth to be able to walk through that door, the evidence of pre-arrest silence must still be "subject[ed] primarily to the trial court's assessment of probative value versus prejudicial effect." *DiNicola, supra* at 336. In our view, the probative value of the Appellant's silence was to show, as was the case in *DiNicola,* that Appellant's refusal to speak to the officers again limited law enforcement's ability to conduct the full investigation that defense counsel was insinuating should have been conducted. *See DiNicola, supra* (stating when an appellant refuses an interview with police and also claims police conducted a deficient investigation, evi-

dence of pre-arrest silence goes to show that the "investigation was obviously limited by [Appellant's] decision to reject the request for an interview[ ]"). While the introduction of pre-arrest silence inherently carries some degree of prejudice, in light of defense counsel's questioning, we conclude it does not outweigh the probative value of the evidence in this case. As noted above, the trial court would have given the jury a double cautionary instruction that they could not use Appellant's silence as substantive evidence of guilt, and they could use it only for the limited purpose of assessing Appellant's credibility. N.T., 7/26/10, at 17, 18.

 In *DiNicola,* defense counsel opened the door while performing a direct examination during its own case, whereas in this case, it was opened during the cross-examination during the Commonwealth's case. However, in our view, it does not make a difference whose witness is on the stand when defense counsel opens the door. We conclude that the Commonwealth would have been permitted to introduce evidence of Appellant's pre-arrest, pre-*Miranda* silence, as a fair response to the inferences raised by defense counsel in cross-examining the Commonwealth's witness. *See DiNicola, supra; Copenhefer, supra; Adams, supra.*

It is also true that the Commonwealth introduced Appellant's voluntary April 28, 2009 statement to police as part of its direct examination, and raised the inference that Appellant's voluntary statement was inconsistent with Z.G.'s injuries. However, defense counsel's questioning went above and beyond that. In this case, defense counsel, through no provocation from the Commonwealth, engaged in the line of questioning that inquired into why law enforcement did not conduct a more comprehensive interview with Appellant. Allowing the Commonwealth to introduce

evidence of Appellant's pre-arrest silence would have answered those inquiries.

Based on the foregoing, we hold that Appellant's constitutional rights would not have been violated had the Commonwealth cross-examined him using evidence of his pre-arrest silence. Therefore, we conclude the trial court did not abuse its discretion. Accordingly, we affirm Appellant's October 14, 2010 judgment of sentence.

Judgment of sentence affirmed.