J-A30018-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| CHARLES ENGELHARDT | |
| Appellant | No. 2040 EDA 2013 |

Appeal from the Judgment of Sentence June 12, 2013
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0003525-2011

BEFORE: LAZARUS, J., MUNDY, J., and PLATT, J.[*]

MEMORANDUM BY MUNDY, J.:                    **FILED MARCH 25, 2015**

Appellant, Charles Engelhardt, appeals from the June 12, 2013 aggregate judgment of sentence of six to 12 years' imprisonment, plus five years' probation, imposed after he was found guilty of one count each of endangering the welfare of a child (EWOC), corruption of minors, and indecent assault.[1]  After careful review, we affirm.

The trial court summarized the relevant factual and procedural history of this case as follows.

> The victim's parents, J.G. (hereinafter "Father") and S.G. (hereinafter "Mother") married in 1981 and had two sons, J.G., Jr. (hereinafter "Brother") and the

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 4304(a)(1), 6301(a)(1)(i) and 3126(a)(7), respectively.

victim "D.G." The victim and his family resided in the northeast section of Philadelphia. Father was a Philadelphia [p]olice [s]ergeant, and Mother was a nurse. As both of D.G.'s parents had attended Catholic school and wanted to provide their sons with a similar education, they enrolled D.G. and Brother at St. Jerome's School, the Archdiocese parochial school located within walking distance of their home.

D.G. began attending St. Jerome's School in kindergarten. Physically, D.G. was small for his age. Despite this, D.G. was very active in school sports and he participated in many extra-curricular activities at St. Jerome's, including serving as altar boy. [Mother] recalled that [D.G.] was an active and rambunctious young boy. D.G.'s classmate and fellow altar boy, [J.S.P]., remembered D.G. as a "happy kid [who] was always joking."

When D.G. was in seventh and eighth grades at St. Jerome's, however, some of his friends noticed a marked change in D.G.'s demeanor. According to [J.S.P.], D.G. became "real dark," and secluded himself from everybody. Another friend, [R.B.], confirmed this change in D.G.'s personality, testifying that D.G. became a "loner" and "did not talk to too many people." During this same time period, D.G. complained of testicular pain. D.G. was examined by a pediatrician and a urologist but the cause of the pain was never determined. According to Mother, around this time D.G.'s appetite diminished and he lost weight.

After graduating from St. Jerome's, D.G. attended Archbishop Ryan High School where his behavior quickly spiraled out of control, and he became a heavy drug abuser. D.G. was expelled from Archbishop Ryan for possession of drugs and weapons. After his expulsion, D.G. attended the International Christian High School where he became good friends with fellow student [L.H.]. Early in their friendship, D.G. and [L.H.] were socializing in D.G.'s basement when D.G. confided that two priests and a teacher had sex with him when he was in the 5th

and 6th grades. [L.H.] was stunned by this revelation, but D.G. did not want to discuss further details of the incident at that time.

[L.H.] testified that D.G. again confided in him about being the victim of sexual abuse during a conversation they were having about a teacher at the International Christian High School whom neither he nor D.G. liked because the teacher was "really touchy, feely" and because of "weird vibes that came from him all the time, weird sexual-type vibes." D.G. and [L.H.] were in a classroom at school when the teacher exhibited what they deemed "creepy" behavior. On this occasion, D.G. again mentioned the abuse to [L.H.].

D.G.'s high school years were a nightmare for D.G. and his parents. According to Mother, D.G. cut his wrists, drew images of a gun to his head, and wrote suicide notes. He obtained psychiatric help at the Horsham Clinic, but the treatment did not help and "things continued to get worse and worse." D.G.'s substance abuse worsened as he continued to use drugs including marijuana, Percocet, Oxycontin, LSD, and ultimately became a "full blown heroin addict." Over the years, D.G. was treated at over twenty drug rehabilitation clinics. During this same time period D.G. was arrested several times for offenses including retail theft and possession of drug paraphernalia. D.G.'s most recent arrest for possession of heroin occurred in November 2011.

D.G.'s parents could not understand the complete change in their son's behavior and personality and they were concerned that serious issues were at the root of the problem. Mother and Father pleaded with D.G. to open up to them but D.G. refused. When D.G. was eighteen or nineteen years old, however, he suddenly confessed to his parents that a priest had sexually abused him. After that revelation, D.G. immediately "shut down" again and refused to discuss it further with his parents. It was apparent to Mother and Father that D.G. was not ready or willing to reveal his entire story. Out of

concern for D.G.'s fragile and agitated state, and fearing that he would disappear and overdose on drugs, Mother and Father decided not to report this revelation to the police.

The underlying issues driving D.G.'s self-destructive behavior finally began to emerge in detail in January 2009, when D.G. was approximately 20 years old. While undergoing treatment for his heroin addiction at a drug rehabilitation facility, D.G. broke down during a group therapy session and revealed to his drug counselor that he had been sexually abused while a young student at St. Jerome's. On January 30, 2009, with the support of his counselor, D.G. called the Philadelphia Archdiocese hotline to officially report the abuse. Later that day, D.G. spoke with Louise Hagner, the victim assistance coordinator for the Archdiocese. Hagner's duties included receiving reports from victims alleging sexual abuse and providing services to the victims. The initial phone call D.G. made to Hagner ultimately led to investigations by the Philadelphia District Attorney's Office and a Grand Jury investigation. These investigations brought to light the details of the sexual abuse of D.G. at the hands of Appellant and Edward Avery, both priests at St. Jerome's and Bernard Shero, a lay teacher at St. Jerome's. All three men were indicted and warrants were issued for their arrests.

D.G.'s accounts of the sexual abuse committed by Appellant varied at different stages of the investigations. A large portion of the jury trial consisted of the defense presenting witnesses and evidence highlighting the inconsistencies and generally attacking D.G.'s credibility. The prosecution provided evidence and witnesses to account for the inconsistencies and corroborate D.G.'s allegations. The jury, as fact-finders [sic], ultimately made a credibility determination in favor of D.G. and found Appellant guilty. The following description of Appellant's sexual abuse of D.G. reflects the consistent [evidence presented and]

sworn testimony of D.G. before the Grand Jury and during the jury trial.

Appellant, a member of the Order of the Oblates of St. Francis de Sales, was assigned to serve as a priest at St. Jerome's Parish and was serving there when D.G. was in fifth grade. One of Appellant's responsibilities included presiding over weekday morning masses. During the winter of 1998-1999, while D.G. was in fifth grade, D.G. assisted Appellant and other priests as an altar boy. D.G.'s responsibilities as an altar boy included setting up for the mass, assisting the priests during the mass, and cleaning up afterwards. One morning that winter while D.G. was cleaning up after a mass conducted by Appellant, Appellant caught D.G. drinking the wine left over from the mass. Appellant scolded D.G and commanded him to return to the sacristy, a small room adjoining the church altar. Once they were seated in the sacristy, Appellant poured himself the remaining wine, offered some to D.G., and asked if he had "ever looked at porno," or if he was sexually interested in boys or girls. Appellant removed pornographic magazines from a briefcase and began to show the pictures to D.G. as he touched and rubbed D.G.'s back. Appellant told D.G. that he wanted D.G. to "become a man." Appellant ended the encounter by telling D.G. that they would see each other again and his "sessions are going to begin soon."

Approximately 1½ to 2 weeks later, D.G. again served the early morning [m]ass with Appellant. After the [m]ass, Appellant asked D.G. to stay behind in the sacristy and told him that his "sessions" were going to begin. According to D.G. everyone else who had served that [m]ass had left by that point. Appellant and D.G. sat down in the same chairs in the sacristy as in their first encounter. D.G. was wearing his school uniform and Appellant was wearing black clothing and his priest collar.

Appellant told D.G., "[i]t's time for [you] to become a man," and began rubbing and caressing

- 5 -

D.G.'s back and leg while assuring D.G. that "God loves [him] and everything is going to be okay. This is what God wants." He told D.G. to get undressed and D.G. complied. Appellant then took off his clothes. According to D.G., Appellant began to masturbate D.G.'s penis and then performed oral sex. D.G. acknowledged having a "slight erection" but "did not ejaculate." Appellant then told D.G. to perform oral sex on him. D.G. complied and Appellant ejaculated on the floor. At this point Appellant told D.G. that he "did a good job" and he was "dismissed." Following this encounter, D.G. walked home but did not tell anyone what had happened. D.G. felt scared, embarrassed, and did not want to get in trouble; he thought he had done something wrong.

D.G. saw Appellant about a week later at which time Appellant told him that they were "getting ready for another session." D.G. testified that he told Appellant that "[i]f he came near me again, I would kill him." Following this conversation, Appellant never talked to D.G. again about "sessions." From that point forward D.G. tried to avoid serving mass with [] Appellant by switching his [m]ass assignments with other altar servers.

Trial Court Opinion, 12/17/13, at 2-6 (footnotes and citations omitted).

On April 12, 2011, the Commonwealth filed an information, charging Appellant with the above mentioned offenses, as well as one count each of rape of a child, involuntary deviate sexual intercourse (IDSI), aggravated indecent assault, as well as four counts of criminal conspiracy.[2] On January 14, 2013, Appellant proceeded to a lengthy, joint jury trial with Bernard

---

[2] 18 Pa.C.S.A. §§ 3121(c), 3123(b), 3125(a)(7), and 903(c), respectively.

Shero.[3]  At the conclusion of the trial on January 30, 2013, the jury found

Appellant guilty of one count each of EWOC, corruption of minors, indecent

assault, and four counts of criminal conspiracy.  The jury was deadlocked as

to IDSI.  The rape of a child and aggravated indecent assault charges were

*nolle prossed*.  On June 12, 2013, the trial court granted Appellant's oral

motion for extraordinary relief to the extent it sought a judgment of

acquittal as to the four counts of criminal conspiracy, but denied the motion

in all other respects.[4]  That same day, the trial court imposed an aggregate

sentence of six to 12 years' imprisonment, followed by five years'

probation.[5]  On June 20, 2013, Appellant filed a timely motion for

modification of sentence, which the trial court denied on July 10, 2013

_____

[3] Shero's appeal is currently pending before this Court at 2164 EDA 2013. As discussed *infra*, Edward Avery pled guilty to certain charges in exchange for a lighter sentence.  Appellant agreed to be tried jointly with Engelhardt. Commonwealth's Brief at 8 n.1.

[4] The Commonwealth has not filed a cross-appeal challenging the judgments of acquittal notwithstanding the jury's verdict on the criminal conspiracy charges.

[5] Specifically, the trial court imposed a sentence of three-and-one-half to seven years' imprisonment for EWOC, two-and-one-half to five years' imprisonment for indecent assault, and five years' probation for corruption of minors.  All sentences were to run consecutively.

without a hearing. On July 11, 2013, Appellant filed a timely notice of appeal.[6]

On appeal, Appellant raises the following seven issues for our review.

> 1. Whether it was [an] abuse of discretion for the [trial] court to admit evidence of Dr. Gerald Margiotti, a pediatrician, who testified that a young patient's complaint of testicular pain was consistent with a child having been sexually abused in a case where there was no objective factual support for his opinion testimony?
>
> 2. (a) Whether the trial court erred in allowing the jury to deliberate on whether Appellant was guilty of conspiracy when the Commonwealth failed to provide sufficient evidence to meet its burden of proving that Appellant violated each element of the crime[?]
>
> (b) Whether the trial court erred in denying Appellant's motion for judgment of acquittal on the charge of conspiracy at the close of the Commonwealth's case[-]in[-]chief and in giving lengthy jury instructions on conspiracy and accomplice liability applicable to the four original separate charges against Appellant where the Commonwealth failed to present sufficient evidence to meet its burden of proof that Appellant violated each element of conspiracy?
>
> (c) Whether the trial court erred in providing the jury with a separate full[-]page verdict sheet listing four charges coupled with each of the four original separate charges against Appellant where the Commonwealth failed to meet its burden of proving conspiracy and where the trial court subsequently acknowledged this failure of proof by

_____

[6] Appellant and the trial court have complied with Pennsylvania Rule of Appellate Procedure 1925.

granting Appellant's post-trial motion for judgment of acquittal on the charge of conspiracy?

(d) Whether the [trial] court's lengthy and undue emphasis on conspiracy and accomplice liability during its jury charge was reversible error mandating a new trial?

(e) Whether the [trial] court's unduly repetitive and grueling conspiracy and accomplice liability charge where the Commonwealth failed to meet its burden of proof which permitted the jury in this case to wrongly infer that Appellant violated the other crimes charges based on erroneous conspiracy and accomplice liability theories was reversible error mandating a new trial?

(f) Whether the [trial] court's instructions wrongly permitted the jury to deliberate on the conspiracy charge listing four separate counts along with the four other charges of [IDSI], indecent assault, [EWOC] and corrupting morals of a minor, thereby making it impossible to determine whether the jury's verdicts were based on unproven conspiracy liability, and this was reversible error mandating a new trial?

3. Whether it was [an] abuse of discretion for the [trial] court not to grant a mistrial on the basis of the Commonwealth's highly prejudicial summation which included statements not supported by the trial record?

4. Whether it was an abuse of discretion for the [trial] court to allow the Commonwealth to cross[-]examine its own witness, Edward Avery, the alleged co-conspirator of Appellant, regarding five unrelated allegations of sexual abuse, where there was no evidence presented concerning these accusations, where they were highly inflammatory and failed to pass a probative/prejudicial test and were inextricably intertwined with the conspiracy charge against Appellant that had not been proven by the Commonwealth and which engaged in further

prosecutorial misconduct in its questioning and summation?

5. Whether the [trial] court abused its discretion and committed legal error in sentencing [] Appellant to a six to twelve year term of imprisonment, as discussed in Appellant's post-sentence motion to modify sentence filed on June 20, 2013, because it substantially exceeded the aggravated range of the applicable sentencing guideline range and was outside the entire sentencing guideline range even though the [trial c]ourt had announced that the sentence would be in the aggravated sentencing guideline range and where the sentence imposed was excessive, unsupported and unreasonable?

6. Whether this Court should grant a remand to the lower court based on newly discovered evidence that could have changed the outcome of the trial?

7. Whether it was an abuse of discretion for the [trial] court to refuse to issue a bench warrant or grant a continuance where critical defense witness, J.G., Jr., Esquire, brother of complainant D.G. failed to appear after [being] subpoenaed and [the] problem [was] compounded by [the trial] court's erroneous answer to [a] jury question on [the] issue?

Appellant's Brief at 5-8.

At the outset, we summarily address some of Appellant's issues, beginning with his entire second issue, surrounding the Commonwealth's failure to provide sufficient evidence to satisfy each element of criminal conspiracy. As noted above, the trial court **granted** Appellant's motion for a judgment of acquittal on all criminal conspiracy counts. Although the Commonwealth argues in its brief in response to Appellant's arguments that it did present sufficient evidence to prove conspiracy, the Commonwealth

- 10 -

has not filed a cross-appeal from the trial court's June 12, 2013 order granting Appellant's motion in part. As a result, any issue pertaining to the criminal conspiracy charges is moot, and we decline to express any opinion on them at this juncture. **See generally Commonwealth v. Weis**, 611 A.2d 1218, 1228 n.9 (Pa. Super. 1992).

We next address Appellant's fifth issue pertaining to the discretionary aspects of his sentence and his sixth issue pertaining to his request for a remand to the trial court for an evidentiary hearing on his claim of after-discovered evidence. We note that Appellant has passed away during the pendency of this appeal.[7] However, consistent with our cases, we decline to dismiss this appeal as moot in its entirety. **See generally Commonwealth v. Bizzaro**, 535 A.2d 1130, 1132 (Pa. Super. 1987).

In **Bizzaro**, the defendant was convicted of IDSI, indecent assault and corruption of minors. **Id.** at 1131. During the pendency of his appeal, Bizzaro passed away. **Id.** This Court noted that our Supreme Court had

_____

[7] This Court was advised of Appellant's death by the filing of a petition to intervene, although no formal suggestion of death was filed in this matter at that time. **See** Application for Leave for Third Party Intervention, 12/22/14, at 2; Joe Dolinsky, _Phila. Priest Dies While Appealing Sexual Abuse Conviction_, PHILA. INQUIRER, Nov. 18, 2014, http://articles.philly.com/2014-11-18/news/56313260_1_engelhardt-altar-boy-former-catholic-priest.

On February 23, 2015, this Court entered an order directing the parties to file a suggestion of death, along with documentation of the same pursuant to Pa.R.A.P. 502(a). Superior Court Order, 2/23/15, at 1. Appellant's counsel filed a response to our order on March 6, 2015, enclosing therewith a copy of Appellant's death certificate.

held that "it is in the interest of both a defendant's estate and society that any challenge initiated by a defendant to the regularity or constitutionality of a criminal proceeding be fully reviewed and decided by the appellate process." ***Bizzaro***, ***supra***, *quoting* ***Commonwealth v. Walker***, 288 A.2d 741, 742 n. * (Pa. 1972). The ***Bizarro*** Court ultimately held that the defendant was entitled to relief on one issue, and in lieu of the normal remedy of a new trial, vacated the judgment of sentence and remanded with instructions for the trial court to "ent[er] … an order of abatement upon record certification of [Bizzaro]'s death." ***Id.*** at 1133.

Consistent with ***Bizzaro***, and based on the issues raised by Appellant, the most this Court could grant Appellant in the form of relief would be a reversal of his judgment of sentence and either discharge or an instruction for the trial court to enter "an order of abatement upon record certification of [A]ppellant's death." ***Id.*** Conversely, the normal remedy Appellant would receive from this Court addressing the discretionary aspects of his sentence would be resentencing. Likewise, the normal remedy Appellant would get from the Court on his claim of after-discovered evidence or a ***Brady***[8] violation would be a remand to the trial court for an evidentiary hearing.[9] As

---

[8] ***Brady v. Maryland***, 373 U.S. 83 (1963).

[9] On July 29, 2014, this Court accepted Appellant's "Application … to Amend Brief and Reproduced Record for Appellant" as a supplemental brief. Superior Court Order, 7/29/14, at 1.

neither of these forms of relief is possible, we decline to address the merits of these issues, as they do not directly "challenge … the regularity or constitutionality of a criminal proceeding." **Walker**, **supra**. We therefore turn to the balance of Appellant's issues that would warrant a reversal and order of abatement if deemed meritorious.

We elect to next address Appellant's first and fourth issues, as they each challenge evidentiary rulings made by the trial court. In his first issue on appeal, Appellant avers that the trial court abused its discretion when it permitted Dr. Gerald Margiotti, D.G.'s pediatrician, to testify that D.G.'s complaint of testicular pain was consistent with sexual abuse. Appellant's Brief at 23. We begin by noting our well-settled standard of review regarding evidentiary issues.

> The admissibility of evidence is at the discretion of the trial court and only a showing of an abuse of that discretion, and resulting prejudice, constitutes reversible error. An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record. Furthermore, if in reaching a conclusion the trial court over-rides or misapplies the law, discretion is then abused and it is the duty of the appellate court to correct the error.

**Commonwealth v. Fischere**, 70 A.3d 1270, 1275 (Pa. Super. 2013) (*en banc*) (internal quotation marks and citations omitted), *appeal denied*, 83 A.3d 167 (Pa. 2013).

The admission of expert testimony is governed by Pennsylvania Rule of Evidence 702, which provides as follows.

### Rule 702. Testimony by Expert Witnesses

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge is beyond that possessed by the average layperson;

(b) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; and

(c) the expert's methodology is generally accepted in the relevant field.

Pa.R.E. 702. Our Supreme Court has held that "the opinion of an expert witness **may** be excluded where no attempt has been made to qualify such witness as an expert in the disputed field." ***Commonwealth v. Duffey***, 548 A.2d 1178, 1186 (Pa. 1988) (citation omitted; emphasis added). "Neither the Pennsylvania Rules of Evidence, nor the Federal Rules of Evidence set out any special procedure for determining whether the witness is qualified to testify as an expert." 1 Leonard Packel & Anne Bowen Boulin, West Pennsylvania Practice § 702-5 (4th ed. 2013).

Additionally, our Supreme Court has held that it is admissible for the Commonwealth to present expert testimony that "the absence of physical trauma is nevertheless consistent with the alleged sexual abuse."

*Commonwealth v. Minerd*, 753 A.2d 225, 227 (Pa. 2000). It therefore follows, *a fortiori*, that it is equally permissible for an expert to testify that the existence of trauma or pain **could be** consistent with alleged sexual abuse. *See Commonwealth v. Fink*, 791 A.2d 1235, 1247 (Pa. Super. 2002) (stating, "[a] physician is permitted to testify that his or her findings following examination are consistent with a victim's allegations of abuse[]").

In this case, Dr. Margiotti was asked if "based on [his] experience, [] testicular pain [has] been associated with child sexual abuse? Is it consistent with child sexual abuse?" N.T., 1/22/14, at 44. Dr. Margiotti responded that it was. *Id.* Under *Minerd* and *Fink*, this was a permissible line of questioning. The Commonwealth never asked Dr. Margiotti if D.G. was abused or if he believed D.G. was telling the truth, so as not to improperly bolster D.G.'s credibility with the jury.

Although Appellant objects that the Commonwealth did not engage in a *voir dire* of Dr. Margiotti, Appellant has not cited to any authority for the proposition that a **formal** *voir dire* is required. To the contrary, as noted above, our Supreme Court has held that a trial court **may** exclude expert testimony if there is no formal qualification. *Duffey*, *supra*. Furthermore, we note the Commonwealth elicited testimony from Dr. Margiotti on direct examination that he had been a practicing pediatrician since 1986, became board-certified in 1988, attended LaSalle University, and attended Hahnemann University for medical school. N.T., 1/22/13, at 35. Dr.

Margiotti also testified that he completed his internship and residency at Hahnemann, is a member of the American Academy of Pediatrics and the Pennsylvania Medical Society. *Id.* at 35-36. Appellant does not dispute any of Dr. Margiotti's medical credentials.

Appellant also argues that Dr. Margiotti never used the words "to a reasonable degree of medical certainty." However, there are no "magic words" required for an expert's opinion to be admissible. *See Commonwealth v. Dennis Miller*, 987 A.2d 638, 656 (Pa. 2009) (stating, "[a] review of the applicable law indicates that 'magic words' need not be uttered by an expert in order for his or her testimony to be admissible[]") (citations omitted). "Rather, the substance of the testimony presented by the expert must be reviewed to determine whether the opinion rendered was based on the requisite degree of certainty and not on mere speculation." *Id.* Finally, to the extent Appellant argues that Dr. Margiotti should not have been permitted to testify as an expert because he did not personally perform the specific examination on D.G., we find this distinction to be immaterial for the purposes of the Rule 702 issue.[10] *See generally Sheeley v. Beard*, 696 A.2d 214, 218 (Pa. Super. 1997) (stating, "[i]t is well-settled in Pennsylvania that a medical expert is permitted to express an opinion which is based, in part, on medical records which are not in

---

[10] Appellant has not made a hearsay argument.

evidence, but which are customarily relied on by experts in her profession[]"). Based on these considerations, we conclude the trial court did not abuse its discretion in admitting Dr. Margiotti's testimony.[11] **See Fischere**, **supra**.

In his fourth issue, Appellant avers that the trial court erred when it permitted the Commonwealth to "cross-examine [Edward] Avery concerning a number of other supposed accusations for which there was no evidence at trial." Appellant's Brief at 42. The Commonwealth counters that the evidence was admissible to impeach Avery's credibility and even if it was improper, Appellant did not suffer any prejudice as a result. Commonwealth's Brief at 36.

At trial, the Commonwealth called Avery during its case-in-chief. Avery previously pled guilty to IDSI and criminal conspiracy and was sentenced to two-and-one-half to five years' imprisonment. N.T., 1/17/13, at 140-141. Relevant to this appeal, during its direct examination, the Commonwealth read into the record the recitation of the facts from Avery's guilty plea hearing.[12] Specifically, the factual basis for Avery's guilty plea to

---

[11] Although our reasoning differs from the trial court, we note "[t]his [C]ourt may affirm [the trial court] for any reason, including such reasons not considered by the [trial] court." **Commonwealth v. Clemens**, 66 A.3d 373, 381 n.6 (Pa. Super. 2013) (citation omitted).

[12] Appellant did not object to the relevance of this testimony when Avery took the stand at trial, nor does Appellant raise such a challenge on appeal.

- 17 -

IDSI was that "sometime during the spring of 1999, [Avery] was 57 years old at the time. While he was serving as a priest at Saint Jerome's Parish, he engaged in oral sexual intercourse with 10-year-old [D.G.]" *Id.* at 156-157. Avery acknowledged he knew those were the facts to which he pled guilty. *Id.* at 157. However, during questioning by the Commonwealth at trial, Avery asserted his innocence, despite his guilty plea, and stated that "[he] had no contact whatever with [D.G.]" *Id.* at 161. Avery also testified that he only pled guilty to get a better sentence. *Id.* at 160. Avery repeated these assertions on cross-examination. *Id.* at 177, 180-181. On redirect examination, the Commonwealth questioned Avery about six other complainants, R.F., R.C., H.A., M.M., G.F., and S.L., all of whom had made claims of sexual abuse against Father Avery. *Id.* at 208-209. Avery denied these allegations. *Id.* at 210. It is this testimony that Appellant objects to, arguing that it was impermissible under Rule 404 and unfairly bolstered D.G.'s credibility. Appellant's Brief at 40.

However, before we may address the merits of this claim, we must first ascertain whether Appellant has preserved it for our review. It is axiomatic that "[i]ssues not raised in the lower court are waived and cannot be raised for the first time on appeal." Pa.R.A.P. 302(a). Our Supreme Court has repeatedly emphasized the importance of issue preservation.

> Issue preservation is foundational to proper appellate review. Our rules of appellate procedure mandate that "[i]ssues not raised in the lower court are waived and cannot be raised for the first time on

- 18 -

appeal." Pa.R.A.P. 302(a). By requiring that an issue be considered waived if raised for the first time on appeal, our courts ensure that the trial court that initially hears a dispute has had an opportunity to consider the issue. This jurisprudential mandate is also grounded upon the principle that a trial court, like an administrative agency, must be given the opportunity to correct its errors as early as possible. Related thereto, we have explained in detail the importance of this preservation requirement as it advances the orderly and efficient use of our judicial resources. Finally, concepts of fairness and expense to the parties are implicated as well.

*In re F.C. III*, 2 A.3d 1201, 1211-1212 (Pa. 2010) (some internal citations omitted); *accord Commonwealth v. Cody Miller*, 80 A.3d 806, 811 (Pa. Super. 2013) (citation omitted).

In the case *sub judice*, when the Commonwealth first began its questioning of Avery regarding the other complainants, counsel for Shero objected stating "this is outside the scope of everything." N.T., 1/17/13, at 208. The trial court immediately stated "[i]t is absolutely proper impeachment at this time." *Id.* The Commonwealth then continued with this line of questioning. At no point, did Appellant note any objection on the record, or join Shero in his objection. As a result, we deem this issue waived on appeal. *See F.C.*, *supra*; *Cody Miller*, *supra*; *Commonwealth v. Woods*, 418 A.2d 1346, 1352 (Pa. Super. 1980) (stating that where "[c]ounsel for appellant never joined in the[] objections [of his co-defendant, the appellant] waived the argument[]"), *appeal dismissed*, 445 A.2d 106 (Pa. 1982).

- 19 -

In his third issue, Appellant avers that the trial court erred when it refused to grant a mistrial after the Commonwealth allegedly made an improper remark when it implied that there were more charges to come against Appellant. *Id.* at 32.

> Our standard of review for a claim of prosecutorial misconduct is limited to whether the trial court abused its discretion. In considering this claim, our attention is focused on whether the defendant was deprived of a fair trial, not a perfect one. Not every inappropriate remark by a prosecutor constitutes reversible error. A prosecutor's statements to a jury do not occur in a vacuum, and we must view them in context. Even if the prosecutor's arguments are improper, they generally will not form the basis for a new trial unless the comments unavoidably prejudiced the jury and prevented a true verdict.

*Commonwealth v. Bedford*, 50 A.3d 707, 715-716 (Pa. Super. 2012) (*en banc*) (internal quotation marks and citations omitted), *appeal denied*, 57 A.3d 65 (Pa. 2012).

We note that "a prosecutor has considerable latitude during closing arguments." *Commonwealth v. Holley*, 945 A.2d 241, 250 (Pa. Super. 2008) (citation omitted), *appeal denied*, 959 A.2d 928 (Pa. 2008). "In reviewing prosecutorial remarks to determine their prejudicial quality, comments cannot be viewed in isolation but, rather, must be considered in the context in which they were made." *Commonwealth v. Sampson*, 900 A.2d 887, 890 (Pa. Super. 2006) (citation omitted), *appeal denied*, 907 A.2d 1102 (Pa. 2006).

> The prosecutor is allowed to vigorously argue his case so long as his comments are supported by the evidence or constitute legitimate inferences arising from that evidence. … Thus, a prosecutor's remarks do not constitute reversible error unless their unavoidable effect … [was] to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant so that they could not weigh the evidence objectively and render a true verdict.

*Commonwealth v. Ragland*, 991 A.2d 336, 340-341 (Pa. Super. 2010), *appeal denied*, 4 A.3d 1053 (Pa. 2010), *quoting Commonwealth v. Smith*, 985 A.2d 886, 907 (Pa. 2009) (citation omitted; brackets in original).  In addition, "comments made by a prosecutor must be examined within the context of defense counsel's conduct."  *Commonwealth v. Chmiel*, 889 A.2d 501, 543 (Pa. 2005) (citation omitted), *cert. denied*, *Chmiel v. Pennsylvania*, 549 U.S. 848 (2006).

> It is well settled that the prosecutor may fairly respond to points made in the defense closing. Moreover, prosecutorial misconduct will not be found where comments were based on the evidence or proper inferences therefrom or were only oratorical flair.

*Id.* at 544 (internal citations and quotations omitted).

In this case, the Commonwealth made the following statement during its summation to the jury.

> [Appellant] told you [his] picture was everywhere. You heard him choose his words carefully, not one child, not one student has come forward.  He picked his words carefully.  Sometimes the subtle is more powerful than the obvious.  What he also didn't tell you was no child, no student has come forward **yet**.

> No child, no student has had the courage that [D.G.]
> has because what he did takes some guts[.]

N.T., 1/25/13, at 142 (emphasis added). It is the Commonwealth's use of the word "yet" that Appellant objected to, as it implied there were other victims out in the world that just had not come forward to accuse Appellant. Appellant's Brief at 39.

However, before the Commonwealth made its closing argument to the jury, Appellant made the following remarks in its summation.

> [Appellant] surrendered and that was February 10, 2011 and that was the first public announcement that [Appellant] was accused of a sexual abuse of an altar boy at Saint Jerome's back in '98, '99 and that it was a brutal sexual attack and [Appellant]'s name and picture was [sic] spread all over the region nationally, the internet, TV, radio, newspapers, national magazines, saying this is a child molester. This man is accused of being a brutal sex abuser of a child. Every pulpit in the Archdiocese of Philadelphia and surrounding region read from the pulpit at every mass that [Appellant] has been accused of these crimes, had been removed from ministry and if you had any information to contact the Archdiocese or the District Attorney's Office.
>
> Ladies and gentlemen, there has not been one child or one student from any of the institutions that [Appellant] was associated with his entire life that came forward to say when I was a student or I was a child and his picture was saturating the media and he sits here today two years later and that's the effect that went out about his reputation ….

N.T., 1/25/13, at 36-37.

The trial court concluded that the Commonwealth's remark was a fair response to the Appellant's closing argument. *See* Trial Court Opinion,

12/17/13, at 11-12 (stating, "[i]n this instance, the Commonwealth was responding directly to a statement made [by] Appellant's counsel with respect to the fact that no other victims had [come] forward – which, per Appellant's counsel, was a reflection of [Appellant]'s innocence[]").  As noted above, it is axiomatic that the Commonwealth "may fairly respond to points made in the defense closing." **Chmiel**, **supra**.  Appellant, through his summation attempted to argue that the Commonwealth had not met its burden in part because D.G. was the only person to come forward and accuse Appellant.  In our view, the Commonwealth was permitted to respond to that argument by logically pointing out that all that meant was that no one else had come forward at that point in time.  As a result, we conclude the trial court did not abuse its discretion when it denied Appellant's request for a mistrial. **See Bedford**, **supra**.

In his seventh issue, Appellant argues that the trial court erred when it denied his request for a bench warrant for D.G.'s brother, J.G., or in the alternative a continuance to investigate why J.G. did not appear.  Appellant's Brief at 55.  Appellant also objects to the trial court's response to a jury question regarding why J.G. did not appear to testify.  **Id.**  Before we may address this issue, we must first address the Commonwealth's argument that Appellant has waived this issue for failure to develop this issue in his brief.  Commonwealth's Brief at 54.

Generally, appellate briefs are required to conform to the Rules of Appellate Procedure. *See* Pa.R.A.P. 2101. Pennsylvania Rule of Appellate Procedure 2119(a) requires that the argument section of an appellate brief include "citation of authorities as are deemed pertinent." Pa.R.A.P. 2119(a). This Court will not consider an argument where an appellant fails to cite to any legal authority or otherwise develop the issue. ***Commonwealth v. Johnson***, 985 A.2d 915, 924 (Pa. 2009), *cert. denied*, ***Johnson v. Pennsylvania***, 131 S. Ct. 250 (2010); ***see also, e.g.***, ***In re Estate of Whitley***, 50 A.3d 203, 209 (Pa. Super. 2012) (stating, "[f]ailure to cite relevant legal authority constitutes waiver of the claim on appeal[]") (citation omitted), *appeal denied*, 69 A.3d 603 (Pa. 2013). Nor will this Court "act as counsel and … develop arguments on behalf of an appellant." ***Commonwealth v. Kane***, 10 A.3d 327, 331 (Pa. Super. 2010) (citation omitted), *appeal denied*, 29 A.3d 796 (Pa. 2011).

In this case, Appellant's argument is devoid of any discussion of our cases, standards, or any other legal authority on the subject of bench warrants, continuances, or jury questions. Appellant's brief has one citation to a civil case involving service and due process and one citation to the Pennsylvania Rules of Civil Procedure. Appellant's Brief at 56. Appellant does not cite to any legal authority to explain or develop his argument as to why he was entitled to a bench warrant or a continuance regarding J.G.'s failure to appear to testify. Nor does Appellant cite to any type of legal

authority to show how the trial court abused its discretion in its answer to the jury's question or how he was prejudiced by the same. Based on these considerations, we conclude Appellant's seventh issue on appeal is waived for want of development. **See Johnson**, **supra**; **Whitley**, **supra**; **Kane**, **supra**.

Based on the foregoing, we conclude all of Appellant's reviewable issues are either waived or devoid of merit. Accordingly, the trial court's June 12, 2013 judgment of sentence is affirmed.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/25/2015